# In the United States Court of Federal Claims

No. 21-759

(Filed:  11 June 2021[*])

```
*****************************************
LOGISTICS HEALTH, INC.,                  *
                                         *
                Plaintiff,               *
                                         *
v.                                       *   Post-award bid protest; technical evaluation;
                                         *   discussions with offerors; FAR 15.306(d);
THE UNITED STATES,                       *   balanced pricing; FAR 15.404-1(g);
                                         *   best-value determination; RCFC 52.1;
                Defendant,               *   judgment on the administrative record;
                                         *   Blue & Gold waiver.
and                                      *
                                         *
QTC MEDICAL SERVICES, INC.,              *
                                         *
                Defendant-Intervenor.    *
                                         *
*****************************************
```

Jason A. Carey of Covington & Burling LLP, with whom were Kayleigh M. Scalzo, J. Hunter Bennett, Alan A. Pemberton, Andrew R. Guy, and Peter B. Terenzio III, all of Washington, DC, for plaintiff.

William P. Rayel of the Department of Justice, with whom were Brian M. Boynton, Robert E. Kirschman, and Douglas K. Mickle, all of Washington, DC, and Aaron K. McCartney of the U.S. Army Legal Services Agency, of Fort Belvoir, VA, for defendant.

Marcia Madsen of Mayer Brown LLP, with whom were David F. Dowd, and Luke Levasseur, all of Washington, DC, and James J. McCullough of Fried, Frank, Harris, Shriver & Jacobson LLP, with whom were Michael J. Anstett, Anayansi Rodriguez Carbo, and Christopher H. Bell, all of Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**HOLTE, Judge.**

---

[*] This Opinion was originally filed under seal on 4 June 2021 pursuant to the case protective order.  The Court provided the parties opportunity to review the Opinion for any proprietary, confidential, or other protected information and submit proposed redactions no later than 8 June 2021.  Plaintiff and defendant-intervenor proposed redactions on 8 June 2021.  The Court accepts the parties' proposed redactions and reissues the order with a few minor, non-substantive corrections and redacted language replaced as follows:  "[XXXXX]."

Plaintiff Logistics Health, Inc. ("LHI") brings this bid protest challenging the United States Army's award of a contract for the third Reserve Health Readiness Program ("RHRP-3") to defendant-intervenor QTC Medical Services, Inc. ("QTC") under Solicitation No. W15QKN-18-R-1000.  Both plaintiff and defendant-intervenor have significant experience on federal medical services contracts, with plaintiff serving as incumbent on the Reserve Health Readiness Program ("RHRP") contract and QTC performing millions of health assessments for service members and veterans through other contracts.  While this contract and solicitation has been through several Army and GAO pre-award and post-award protests, as well as corrective action from the Army, defendant-intervenor QTC has consistently remained the awardee.  Pending before the Court is plaintiff's motion for judgment on the administrative record, the government's cross-motion for judgment on the administrative record, and defendant-intervenor's cross-motion for judgment on the administrative record.  For the following reasons, the Court **DENIES** plaintiff's motion and **GRANTS** the government and defendant-intervenor's motions.

I.    **Background**

      A.  **The Solicitation**

The Army's RHRP contract is for "health readiness services" to the Service Components ("SCs") of the "Reserve Components (*i.e.*, Army Reserve and Guard, Air Force Reserve and Guard, Navy Reserve, Marine Forces Reserve, Coast Guard Reserve), Active Components and Department of Defense Service Civilians throughout the U.S., its Territories, the District of Columbia, [and] Germany."  AR at 482.  This request for proposals ("RFP") is for the third RHRP contract, and plaintiff has been the incumbent performer of two predecessor contracts for nearly the last two decades.  *Id.* at 11309.  The RFP is for a single-award indefinite delivery indefinite quantity task order contract with a maximum dollar value of $999,000,000.  *Id.* at 482.  The performance work statement ("PWS") describes the commercial services to be provided and requires the contractor to provide (among other services) immunizations, physical examinations, periodic health assessments, mental health assessments, limited dental treatment, and laboratory services.  *Id.* at 1140.

The contractor will provide health services:  (1) at "group event gatherings of Service Members . . . at SC-designated sites (e.g., armories, drill halls)"; (2) "through the Contractor's Call Center"; and (3) "within the contractor's network private sector providers."  *Id.* at 1140.  The contractor "must be able to meet surges for various services," providing care to tens of thousands across the nation.  *Id.* at 1141 ("The greatest requirement for group events thus far was a single week in which more than 18,600 [periodic health assessments], 16,500 dental examinations, 52,000 immunizations, 6,550 audiograms, 13,900 blood draws, 3,300 panoramic x-rays, 3,150 EKGs, and 19,550 vision screens were requested in 351 locations in 49 states and Territories. . . .  Up to 21,490 [periodic health assessments], 24,000 audiograms, and 23,150 dental exams in group events have been requested in other weeks.").  The contractor must provide all personnel, equipment, and materials, including vaccines, needed to successfully perform each group event.  *Id.* at 1140–41.  The contractor must also have a network of trained and credentialed providers able to travel to a government site at short notice on weekends and

must properly manage a complex cold-chain transportation and storage system for vaccines. *Id.* at 1142, 1174.

The Army planned to award the contract to the proposal that provides the "best value" under the RFP's four evaluation factors, in descending order of importance: technical, past performance, price/cost, and small business participation. *Id*. at 1238. "When combined, all non-price/cost factors are significantly more important than Price/Cost." *Id*. The technical factor is divided into three subfactors, which are also listed in descending order of importance: technical scenarios, management/staffing, and transition/quality assurance. *Id.* at 1239. For each technical subfactor, contractors received a rating of "Outstanding," "Good," "Acceptable," "Marginal," or "Unacceptable"—the compilation of these ratings "form[ed] the basis of the Technical Factor rating." *Id.* at 1240–41.

## B. Plaintiff's Proposal

The Army issued RFP No. W15QKN-18-R-1000 on 22 November 2017, and proposals were due 8 January 2018. AR at 227. Three contractors, QTC, LHI, and another offeror, submitted proposals in response. *Id*. at 229. Plaintiff stressed its incumbency of nearly 17 years in describing its services: "Since 2001, LHI has been honored to help RHRP customers and SMs by providing them with more than 22.5 million services to meet their readiness objectives." *Id.* at 11180 (LHI Proposal). LHI noted it has "the staff, infrastructure, processes, and network of trained healthcare professionals (HCPs) and dentists in place to continue to deliver high-quality services in support of health readiness requirements and deployment objectives of in-scope Service Components (SCs)." *Id.* at 11179. Plaintiff provided detailed responses to each of the four solicitation factors, particularly highlighting its technical experience as the existing RHRP provider. *Id.* at 11180 ("We support Group Events nearly every weekend, completing 29,000 such events . . . and nearly 12 million services since 2008. . . . We have completed 2,681,522 PHAs, 669,990 MHAs, and 157,670 PDHRAs either In-Clinic or through our Call Center. Over the course of RHRP II, LHI helped increase readiness for U.S. Army Reserve (USAR) and the Army Reserve National Guard (ARNG) by approximately [XX]%."). Plaintiff also discussed its network size, audiology vans, transition-in plan, and proposed prices. *See, e.g., id.* at 11188, 11250, 11323, 11424. Plaintiff's final price estimate was $848,582,938.30. *Id.* at 11424.

## C. Defendant-Intervenor's Proposal

QTC's proposal stressed its "specific expertise and core competencies required for successful execution of RHRP-3" and "proven history of working . . . on other federal medical service contracts." AR at 10577 (QTC Proposal). QTC specifically detailed its experience working with the Department of Veterans Affairs for over 20 years, "perform[ing] 5 million disability and separation health assessments . . . for SMs and Veterans using group event and in-clinic settings." *Id.* at 10579. QTC emphasized having a sizeable team from which it could draw personnel, detailing its "prime offeror, major subtractors, and small business subcontractors." *Id.* at 10577–78. QTC, like plaintiff, discussed its network size, audiology vans, transition-in plan, and proposed prices. *See e.g., id.* at 10692, 10608, 10727–28, 10835. QTC's final price estimate was $899,533,755.74. *Id.* at 10835.

### D.  Pre-Award GAO Protest, First Award Decision, Post-Award GAO Protest, and Corrective Action

On 2 March 2018, plaintiff filed an Army Material Command ("AMC") pre-award protest on the terms of the RFP.  AR at 2704.  Plaintiff protested:  (1) the technical evaluation for being "based exclusively on two narrowly-drawn [sic] scenarios"; (2) the RFP for using fixed amounts for various costs when "it is highly likely that other offerors' actual cost would be far higher than that amount"; and (3) the RFP for "contain[ing] ambiguities regarding which documents count towards the page limitations."  *Id.* at 2705–06.  On 15 March 2018, plaintiff filed a protest on the same issues at the GAO.  *Id.* at 2671–73.  The AMC dismissed plaintiff's protest on 4 April 2018 because "LHI also filed the exact same protest at the Government Accountability Office ('GAO') challenging the same solicitation at issue in LHI's AMC-Level protest," and "if a protest is filed with an external forum on the same solicitation at issue in an AMC-Level protest, the AMC-Level protest will be dismissed."  *Id.* at 2731.  The GAO dismissed plaintiff's protest on 13 April 2018, stating "[s]ubsequent to the filing of this protest, the agency has represented that it intends to take actions which will render the protest academic.  Specifically, the agency represents that it will review its requirements and amend the solicitation."  *Id.* at 2703.

After amending the solicitation, the government received three proposals, including proposals from LHI and QTC, and on 19 December 2018 the government "determined that all 3 shall remain in the competitive range and discussions will be conducted" in accordance with FAR 15.306(d).  *Id.* at 12318.  Discussion letters were sent on 11 February 2019 for the initial evaluation phase and on 7 June 2019 for the interim evaluation phase, and discussions were held with all three offerors.  *Id.* at 3118.  The government closed discussions and requested final proposal revisions on 24 October 2019, with final proposal revisions due 12 November 2019.  *Id.*  LHI and QTC timely submitted final proposal revisions.  *Id.*  The Army selected QTC for the award by finding QTC's proposal represented the best value and determining it was not worth the associated price premium to select plaintiff's higher-rated proposal.  *Id.* at 2500–51.  On 27 March 2020, the Army notified plaintiff it awarded the RHRP-3 contract to QTC.  *Id.* at 2506.

Plaintiff filed a protest with the GAO on 13 April 2020 and requested outcome prediction alternative dispute resolution ("ADR") on 26 June 2020.  *Id.* at 3309, 3317, 4525.  Outcome prediction ADR was held 1 July 2020.  *Id.* at 4526 (Notice of Ground Rules for Alternative Dispute Resolution).  At outcome prediction ADR, the GAO "indicated it was inclined to believe that based on the information provided by QTC and the Army," plaintiff's proposed program manager "did not have the necessary qualifications to satisfy PWS Paragraph 2.20."[1]  *Id.* at 242.  On 2 July 2020, the Army took corrective action according to the GAO's outcome prediction, notifying the GAO it would reevaluate LHI and QTC's proposals "as to the qualifications of the program managers proposed for each in accord with GAO's findings that the QTC PM did not

---

[1] PWS Paragraph 2.20 requires:  "The Contractor shall designate a primary POC for the Government's communication and overall management of the Contractor's effort.  That individual shall have at least a bachelor's degree, 10 years of experience in the health care field, and five years' experience managing large, complex programs dispersed over a wide geographic area.  The years of health care and program management experience can be concurrent."  AR at 800 (Performance Work Statement, January 24, 2018).

possess the requisite experience required by the solicitation, and the LHI PM did." *Id.* at 475. The Army stated it "reserves the right to re-open discussions regarding this or other matters and to take whatever additional corrective action deem[ed] appropriate." *Id.* On 8 July 2020, the GAO dismissed plaintiff's protest by concluding, "[t]he agency's corrective action renders the protest academic." *Id.* at 477–78.

The Army determined in corrective action that a deficiency existed in QTC's proposal because its program manager did not meet the RFP's experience qualifications. AR at 12133. The Army had not previously informed QTC of this deficiency, so to allow QTC to be "permitted the opportunity to address this deficiency during the discussion process," the Army issued an evaluation notice and allowed QTC to address the deficiency by revising its proposal. *Id.* at 12136. The Army did not request or solicit any other proposal changes. *Id.* at 3094.

### E.  Second Award, Debriefing, and GAO Protest

The government gave QTC an opportunity to address the deficiency because QTC "was never permitted the opportunity to address this deficiency during the discussion process." AR at 3097 (Source Selection Information). An evaluation notice was issued to QTC on 23 July 2020. *Id.* QTC "revised their Program Manager selection and submitted their update to the Government on 31 July 2020." *Id.* QTC's "response was evaluated and deemed acceptable," and the government found QTC's "revised proposal meets the requirements of the solicitation and their rating was adjusted back to Acceptable." *Id.*

On 6 October 2020, the Army notified plaintiff it re-awarded the contract to QTC. *Id.* at 3146. On 19 October 2020, plaintiff filed a protest of the re-award decision at the GAO. *Id.* at 4591 (Protest of Logistics Health, Inc. Under Solicitation No. W15QKN-18-R-1000). Plaintiff argued: "the Army misevaluated both offerors' technical proposals" for several reasons, including reasons related to QTC's proposed network size and the parties' offers to provide audiology vans; "the Army's conduct of discussions was unequal"; "the Army misevaluated QTC's past performance"; "the Army failed to evaluate QTC's unit prices for balance"; and "the best value determination is unreasonable." *Id.* at 4592–93. Plaintiff requested outcome prediction ADR on 29 December 2020. *Id.* at 5084 (LHI Request for Outcome Prediction, filed December 29, 2020). QTC and the government expressed opposition to plaintiff's request for outcome prediction ADR and encouraged the GAO to issue a written decision. *Id.* at 5085 (QTC Response to LHI Request for Outcome Prediction, dated December 30, 2020), 5086 (Army Response to LHI Request for Outcome Prediction, dated December 31, 2020). The GAO conducted outcome prediction ADR on 8 January 2021. *Id.* at 5087 (Notice of Ground Rules for Outcome Prediction Teleconference). Plaintiff withdrew its GAO protest on 12 January 2021 after the GAO conducted outcome prediction and informed all parties of its likely decision. *See* Order, ECF No. 16.

### F.  Procedural History Before This Court

Plaintiff filed its complaint in this bid protest on 15 January 2021, along with a motion to seal the complaint, a proposed redacted complaint, and a motion for protective order. *See* Compl. for Declaratory and Injunctive Relief, ECF No. 1; Pl.'s Mot. for Leave to File Under

Seal, ECF No. 3; Redacted Compl. for Declaratory and Injunctive Relief, ECF No. 4; Pl.'s Mot. for Protective Order, ECF No. 5. On 4 February 2021, the Court granted the government's unopposed motion "requesting an advisory opinion" from the GAO "concerning the merits of the protest." Order, ECF No. 21; Def.'s Unopposed Mot. for Judicial Req. of an Advisory Op. from the GAO, ECF No. 15.

On 12 February 2021, the government filed an unopposed motion to file the AR on a CD-ROM. *See* Def.'s Unopposed Mot. to File the Admin. R. on a Portable Storage Disc, ECF No. 27. The Court granted the government's motion on 16 February 2021, and the government filed the AR via CD-ROM on the same day. *See* Order, ECF No. 28; Def.'s Notice of Filing Admin. R., ECF No. 29. On 2 March 2021, the GAO filed its advisory opinion. *See* GAO Advisory Op., ECF No. 31.

On 9 March 2021, plaintiff filed its motion for judgment on the administrative record ("MJAR"). *See* Pl.'s Mot. for J. on the Admin. R., ECF No. 32. On 26 March 2021, defendant-intervenor filed its cross-MJAR. *See* Def.-Intervenor's Opposition to Pl.'s Mot. for J. on the Admin. R., and Cross-Mot. for J., ECF No. 34 ("Def.-Intervenor's Cross-MJAR"). On the same day, the government filed its cross-MJAR, as well as an unopposed motion to amend the AR. *See* Def.'s Cross-Mot. for J. on the Admin. R. and Resp. to Pl.'s Mot. for J. on the Admin. R., ECF No. 36 ("Gov't Cross-MJAR"); Def.'s Unopposed Mot. to Amend the Admin. R., ECF No. 35. The Court granted the government's motion to amend the AR on 1 April 2021. *See* Order, ECF No. 37. Plaintiff filed its reply in support of its MJAR and response to defendant-intervenor and the government's cross-MJAR on 9 April 2021. *See* Pl.'s Reply in Support of Its Mot. for J. on the Administrative R. and Resp. to Def. and Def.-Intervenor's Cross Mots. for J. on the Administrative R., ECF No. 38. On 21 April 2021 the government and defendant-intervenor filed replies in support of their cross-MJARs. *See* Def.-Intervenor's Reply in Support of Its Cross-Mot. for J. on the Administrative R., ECF No. 40; Def.'s Reply to Pl.'s Resp. to Def.'s Cross-Mot. for J. on the Administrative R., ECF No. 41 ("Gov't Reply"). The Court held oral argument on the parties' cross-MJARs on 13 May 2021. *See* MJAR Oral Argument Transcript, ECF No. 43 ("Tr.").

## II.    Legal Standard

### A.    Bid Protest Jurisdiction & APA Standard of Review

The Tucker Act provides this Court jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). To be an interested party, a protestor must show it is an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award or failure to award the contract." *PDS Consultants, Inc. v. United States*, 907 F.3d 1345, 1356 (Fed. Cir. 2018) (internal quotation marks and citations omitted).

In rendering such judgment, this Court "review[s] the agency's decision pursuant to the standards set forth in section 706 of title 5" of the Administrative Procedure Act ("APA"). 28

U.S.C. § 1491(b)(4); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). "Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. §706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000)). Under this standard, "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). "Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43). "The arbitrary and capricious standard applicable here is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

## B. Judgment on the Administrative Record in a Bid Protest

RCFC 52.1(c) "provides for judgment on the administrative record." *Huntsville Times Co. v. United States*, 98 Fed. Cl. 100, 104 (2011); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). Rule 52.1(c) was "designed to provide for trial on a paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d at 1356.

This Court may set aside a contract award if: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Domenico Garufi*, 238 F.3d at 1332. "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). "[D]e minimis errors do not require the overturning of an award." *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996). "De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are." *Id.* (internal quotation marks omitted) (quoting *Andersen Consulting v. United States*, 959 F.2d 929, 935 (Fed. Cir. 1992)). A bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced [the plaintiff]" by showing "there was a 'substantial chance' it would have received the contract award but for the errors." *Bannum, Inc.*, 404 F.3d at 1353 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

Technical ratings fall within a category of "discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). "Procurement officials have substantial discretion to determine which proposal

represents the best value for the government." *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting *E.W. Bliss*, 77 F.3d at 449) (internal quotation marks omitted). A protester alleging unequal treatment in a technical evaluation "must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Office Design Group v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).

### C. Permanent Injunction

When deciding whether a permanent injunction is warranted, a court considers:

(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).

### III.   Parties' Arguments

#### A.  Whether the Army Misevaluated the Offerors' Technical Proposals

Plaintiff argues QTC intentionally misled the Army into overcounting QTC's proposed network of RHRP providers for contract performance. *See* Pl.'s Mem. in Supp. of Its Mot. for Judgment on the Admin. R., ECF No. 32-1 ("Pl.'s MJAR") at 10–11, 15–16. The government responds it merely made conclusions regarding the size of QTC's existing provider network, and QTC argues it was not required to offer specific details regarding the number of providers or show it has a "developed provider network that could provide services at the time of proposal submission." Gov't Cross-MJAR at 15–19; Def.-Intervenor's Cross-MJAR at 6–15. Plaintiff also argues the government treated the offerors unequally by awarding QTC, but not plaintiff, a strength in the evaluation for providing mobile vans to perform audiology tests. Pl.'s MJAR at 16. According to the government, plaintiff's proposed use of audiology vans did not offer the same benefits as QTC's proposed use of audiology vans, and QTC argues plaintiff offered audiology vans merely as an alternative option, rather than providing them where necessary. Gov't Cross-MJAR at 21–22; Def.-Intervenor's Cross-MJAR at 16–17 (citing AR at 274). Plaintiff further argues the Army wrongly gave QTC a strength, instead of "a significant weakness or deficiency," for committing to meet a key transition milestone within [XXX] days of contract award. Pl.'s MJAR at 20–23. The government and QTC explain QTC did propose to complete its transition within [XXXXX] months of the contract award, *i.e.* [XXX] days. Gov't Cross-MJAR at 23–25; Def.-Intervenor's Cross-MJAR at 20–27. Additionally, plaintiff argues the government failed the RFP's requirement to evaluate proposals against the major requirements of the entire PWS. Pl.'s MJAR at 23–26. The government argues there is no requirement to document offerors' compliance with every PWS requirement, while QTC argues plaintiff's claim is time barred under *Blue & Gold Fleet, L.P. v. United States*. Gov't Cross-MJAR at 28–33; Def.-Intervenor's Cross-MJAR at 27–29.

### B.  Plaintiff's Other Arguments

Plaintiff argues the Army wrongly gave QTC more opportunities to improve its offer than it gave LHI, both before the first award and before the second award.  Pl.'s MJAR at 26–29.  The government explains it was not required to hold extra rounds of discussions with plaintiff when it had no further deficiencies or significant weaknesses to discuss and argues plaintiff "has not demonstrated it was prejudiced by the allegedly unequal discussions."  Gov't Cross-MJAR at 36–44.  QTC argues plaintiff's position conflicts with the FAR mandate to tailor discussions to each offeror's proposal and plaintiff cannot establish competitive prejudice from the government's actions.  Def.-Intervenor's Cross-MJAR at 29–35.  Plaintiff also argues the Army failed to evaluate QTC's unit prices for balance, which created a risk the Army would end up paying unreasonably high prices.  Pl.'s MJAR at 29–37.  According to the government, it had no obligation to analyze individual procedure prices that are not line items or subline items of the solicitation.  Gov't Cross-MJAR at 28–33.  QTC argues the government is not required to analyze every procedure price for balance and asserts plaintiff's challenge is untimely under *Blue & Gold*.  Def.-Intervenor's Cross-MJAR at 37–38.  Plaintiff argues the Army's best value analysis is flawed because a large portion of QTC's supposed price advantage is illusory, while the government and QTC respond that the source selection authority reasonably compared the offerors' total evaluated prices and argue plaintiff's argument is time barred.  Pl.'s MJAR at 37–39; Gov't Cross-MJAR at 33–36; Def.-Intervenor's Cross-MJAR at 38–39.

## IV.   Whether the Army Misevaluated the Offerors' Technical Proposals

### A.  Whether the Army Misevaluated QTC's Network Size

Plaintiff argues the Army made a "fundamental error" by believing the size of QTC's network of providers for RHRP was over [XXXXXXX] even though QTC "failed to specify *any* number of providers for its RHRP network."  Pl.'s MJAR at 10–11 (emphasis in original).  The government responds "that DoD did not reach th[e] conclusion" plaintiff alleges regarding the size of QTC's network; rather, the government merely "concluded that QTC's team had an existing network of more than [XXXXXXX] providers that it could draw from to form its RHRP network, if it won the award."  Gov't Cross-MJAR at 15–16.  QTC argues no "provision required offerors to demonstrate specific numbers of providers—or to have a developed provider network that could provide services at the time of proposal submission or immediately upon award," since "such a proposal requirement would have unfairly favored the incumbent and improperly thwarted competition."  Def.-Intervenor's Cross-MJAR at 7.

The parties used standards in the PWS as a guide for providing network information.  AR at 1141 (the PWS, dated May 2, 2018).  The PWS states contractors "shall develop, administer, train, and coordinate a nationwide network of private sector [health care providers] used to provide health readiness services" in addition to "provid[ing] all materials, labor and equipment to provide services in group events."  *Id.*  The PWS also provides contractors, after award, must "develop a force of trained personnel with needed licensure, certification and information system access in sufficient numbers to conduct the services."  *Id.* at 1143.  The solicitation prompts contractors to describe their overall approach and process to specific scenarios, such as group

event requests seen in Scenario 1.  *Id.* at 1286.  Plaintiff highlighted this language in arguing offerors were required to propose specific networks for RHRP.  Pl.'s MJAR at 11, 14.  The government pointed to the language in the PWS to explain contractors need only "[d]evelop" trained personnel upon award and the PWS "contemplates a maximum 12-month transition period, *after which* the contractor will be required to provide full RHRP services."  Gov't Cross-MJAR at 6–7 (emphasis added).  Plaintiff asserts the Army's conclusion regarding QTC's network size was "arbitrary and capricious" because the Army failed to rationally evaluate the size and composition of Team QTC.  Pl.'s MJAR at 11–14.

The Federal Circuit has noted, "[c]ourts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).  The PWS required contractors, upon award, to "develop, administer, train, and coordinate a nationwide network of private sector [health care providers]." AR at 1141.  In response to the solicitation, QTC contended its existing network consists of more than [XXXXXXX] individuals "to demonstrate their process for obtaining, credentialing[,] and maintaining the provider network."  Tr. at 16:19–20:11.  The Army understood QTC's network number as related to QTC's overall response team:  "The QTC team has more than [XXXXXXX] in its network of providers to provide RHRP-3 services."  AR at 12817.  The Army did not overcount the size of QTC's RHRP-3 network, but rather recognized QTC's network of over [XXXXXXX] to be a pool of personnel from which QTC could draw upon to provide services, including, but not limited to, RHRP-3 services.  *Id.*  Nothing in the solicitation required QTC to provide exact figures for an RHRP network in its proposal, including the solicitation's scenario prompts.  *See id.* at 1141 (stating the contractor "shall develop, administer, train, and coordinate a nationwide network of private sector [health care professionals] used to provide health readiness services" in addition to "provid[ing] all materials, labor and equipment to provide services in group events").  QTC did what the solicitation required:  it provided figures detailing the existing network it could draw from to "develop, administer, train, and coordinate" a nationwide network to serve the contract.  *Id.*  When asked at oral argument how QTC failed regarding its network proposal, plaintiff could not provide concrete examples and simply asserted QTC had no legitimate numbers to show for its RHRP network.  Tr. at 27:16–21 ("I think it's uncontested at this point that the [XXXXXXX] number is not the network for RHRP-3, . . . I think all parties are in agreement that the [XXXXXXX] number is just every provider in all of these networks.").

QTC's proposal offers great specificity regarding its network personnel, and it demonstrates how it calculates its overall network from other providers.  AR at 10692 ("The current total number of unique HCPs and dentists in our network is [XXXXXXX]; the number of unique HCPs for dentists, PAs and NPs, physicians, optometrists, audiologists, and mental health professionals in [its] current integrated network is [XXXXXXX].").  QTC included tables in its proposal to demonstrate the arrangement of "Team QTC's integrated network of HCPs."  *Id.* ("Table 7 shows Team QTC's integrated network of HCPs for Scenarios 1 and 2. . . .  Table 8 further details the number of locations and the types of HCPs by state and territory.").  QTC also

indicated its broad geographic range in describing its network pool: "Team QTC combines the resources of the prime and all teammates to ensure comprehensive coverage and surge capability for RHRP-3." *Id.* at 10693. The Army was rational in awarding QTC the contract because it understood QTC's well-explained responses and experience working within its broad network. It is noteworthy QTC was only awarded an "acceptable" rating for management/staffing, as was LHI. *Id.* at 13113. This "acceptable" rating indicates the agency did not find QTC's figure to be particularly persuasive overall and demonstrates the agency fully considered the nature of QTC's personnel in determining its overall weight upon the contract award. When asked about the "acceptable" rating at oral argument, counsel for the government stated the rating was rational because: "QTC's approach to recruitment, development, credentialing, monitoring and maintenance of [its] provider network . . . meet[s] the PWS requirements." Tr. at 31:23–32:1. QTC further explained its "proposal does have . . . [a] statement about having a proven history of [QTC's network] working together, and . . . it lays out its current integrated network, it lays out the geographic coverage of that [network], breaks it down by . . . types of provider, and basically shows that QTC has that base to draw from to have an adequate RHRP-3 network to meet the requirements of the PWS." Tr. at 32:10–17. The Court does not have the authority to second-guess the judgment of the agency in instances such as this. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."). Based on the submissions QTC included in its proposal and the narrow arbitrary and capricious standard under which this court reviews the agency's decision, the Army's acceptance of QTC's [XXXXXXX]-person network was not arbitrary and capricious as a matter of law.[2] *See Ala Aircraft Indus.*, 586 F.3d at 1375.

### 1. Whether QTC Made a Material Misrepresentation Regarding Its Network

Plaintiff also argues "that QTC wrote its proposal in a manner calculated to mislead the agency," which "materially influenced the Army's consideration of its proposal." Pl.'s MJAR at 15–16 (citing *GTA Containers, Inc. v. United States*, 103 Fed. Cl. 471, 483 (2012)). The government asserts plaintiff's argument QTC materially misrepresented its network "is just a repackaging of its erroneous argument that DoD misunderstood QTC's proposal." Gov't Cross-MJAR at 19. QTC explains, "the language on which LHI relies was not misleading, and there is no evidence that it affected the source selection decision." Def.-Intervenor's Cross-MJAR at 8.

Plaintiff asserts "[t]his Court will set aside an award when (1) the awardee made a false statement; and (2) the agency relied on that false statement in selecting the awardee's proposal for contract award." Pl.'s MJAR at 16 (citing *GTA Containers*, 103 Fed. Cl. at 483). QTC was

---

[2] The GAO analyzed QTC's submission and LHI's argument in terms of RHRP personnel. GAO Advisory Op. at 12–13. The GAO clarified while QTC's RHRP network may be closer to "[XXXXXXX] commercial network providers," such a number was reasonable. *Id.* at 13. GAO did a thorough analysis and concluded it "would not have objected to the agency's evaluation." *Id.* at 10; *see also id.* at 13 ("We would have found that even if the agency had credited QTC with only [XXXXXXX] network providers, the evaluators' assessment that the firm proposed a sufficient network would remain, leaving intact the evaluation of offerors' proposals and the best-value tradeoff analysis based on those evaluations"). Additionally, the GAO "would not have concluded that the agency's error in crediting QTC with [XXXXXXX] providers, rather than [XXXXXXX] was prejudicial to [plaintiff]." *Id.*

specific in its proposal about the health care providers and other personnel within its network, explaining the roles of its personnel through detailed charts. *See* AR at 10692.  QTC also has extensive experience in working with its pool of personnel on other similar contracts. *Id.* ("From supporting other DoD, RC, and VA programs, our HCPs have expertise with medical and military assessments, DoD classifications, and combat-related behavioral health issues.").  The Army understood the nature of QTC's experienced network, noting "[t]he QTC team has more than [XXXXXXX] in its network of providers to provide RHRP-3 services." *Id.* at 12817.  LHI has not illustrated how QTC materially misrepresented its network because QTC did not make a false statement regarding its network personnel nor did the Army rely upon a false statement. *Id.* at 10692, 12817.  Given the specificity in QTC's proposal regarding its network size and the Army's understanding of QTC's network, the Court does not view QTC as having mislead the Army in any material way. *See Planning Research Corp. v. United States*, 971 F.2d 736, 741 (Fed. Cir. 1992).

### B. Whether the Army Irrationally Gave QTC a Strength for Providing Audiology Vans

Plaintiff argues because LHI and QTC's auditory van proposals are substantively the same, "the Army's evaluation [awarding QTC a strength but not awarding plaintiff a strength] was therefore both unreasonable and unequal." Pl.'s MJAR at 16.  In response, the government offered a key difference in the proposals:  QTC "provides" auditory vans while LHI merely "offers a mobile unit option." Gov't Cross-MJAR at 21–22; AR at 10602 (QTC Proposal), 11250 (LHI Proposal).  Plaintiff's proposed "approach to performing audio services in an ambient environment" states its "process for providing audio services is to confirm that a quiet room will be available to conduct audio testing.  If there is no quiet room available, [plaintiff] will offer a mobile unit option to conduct audio services in a non-ambient environment." AR at 11250.  Plaintiff notes it will "set up the audio testing area and use a sound meter to define the adequacy of the room to determine if the audiometric test room or hearing booth are in compliance with Federal regulations or American National Standards Institute (ANSI) specifications" before the event. *Id.*  Should ambient sound levels be too high, plaintiff proposes to "notify the GE POC that we cannot test in that environment and look for alternative space." *Id.*  Plaintiff also "is committed to the use of the [XXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXX] testing equipment (when available), which has integrated noise monitoring and will only record results when ambient noise levels are within acceptable ranges." *Id.* at 11250–51.  Plaintiff does allow, however, for testing in unacceptably high ambient noise levels "[i]f the customer requests services despite the environment," even though "performing audio tests in environments that are outside of acceptable ranges is outside of guidance and can result in incorrect readings that may require additional testing and costs." *Id.* at 11251.

QTC's proposal notes its "[XX] mobile unit fleet, in conjunction with [its] subcontractor's mobile hearing vehicles to expand as needed to support Scenario 1 events, can be relocated within [X] hours of notice." AR at 10601.  According to QTC, it "provides additional options to the government by providing medical, dental, audiology, and administrative mobile vehicles to meet the functional requirements of RHRP-3" in case "indoor space at an event location is unavailable." *Id.* at 10602.  QTC proposes that "[e]ach mobile unit designated to be

used for audiological testing will be equipped with a portable Audiology Kit consists [sic] of a [XXXXXXXXXXXXXXXXXX] [sic] with [XXXXX] corresponding Sound Level Meters (SLMs) which can conduct up to [XXX] audiological exams in an 8 hour day." *Id.* QTC further states "[b]efore [group] event[s]" it will "work with the unit POC to determine the best low-noise environment for audiology examinations based on the layout of the group event location." *Id.* at 10608. In the continental U.S., "if a low-noise environment is not available, the event lead will either determine a viable alternative low-noise environment with the unit POC or request a mobile unit." *Id.* Counsel for QTC explained at oral argument: "mobile services . . . are a regular part of [QTC's] . . . approach to providing services under [other similar contracts], and under this contract." Tr. at 45:4–7.

The Army awarded LHI, QTC, and a third offeror ratings of "good" for the overall technical factor, which "was the most important [f]actor." AR at 13252 (Source Selection Decision). The source selection decision's tradeoff analysis noted "QTC received two Strengths under Subfactor 1, Technical Scenarios (the most important Subfactor), whereas LHI and [the other offeror] each only received one Strength under Subfactor 1." *Id.* at 13255. The first strength QTC received in subfactor 1 was "the use of mobile audiology solution[s], [which] will allow the Offeror to perform 100% of the services at group events within the time allotted for the event." *Id.* QTC can accomplish this, according to the government, because "[t]he mobile vans can be located to areas where there is no hindrance on accurate testing," which "provides the Government with accurate testing and no need for repeat services." *Id.* This means "the government would not incur cost of repeat testing," which "exceeds the capabilities of the requirement and is advantageous to the Government during contract performance." *Id.* The government justified its rating of QTC by noting QTC's "approach exceeds the PWS requirement in providing a technical approach to accomplishing audiology testing in an ambient noise environment through the utilization of mobile audiology vans that can be easily located to noise-free environments, which increases the accuracy, consistency, repeatability and reliability of audiogram results." *Id.* at 13253.

Plaintiff argues "the Army awarded QTC a strength for offering audiology vans, but failed to award [plaintiff] a strength for offering the same thing." Pl.'s MJAR at 16. According to plaintiff, "this is a textbook case of unequal treatment." Tr. at 42:9–10. Specifically, plaintiff "is asking the Court to find that the [g]overnment should have awarded [plaintiff] a strength, that if it had awarded [plaintiff] a strength, that would have been discussed in the source selection decision just as QTC's was, and it would have changed the awarding authority's conclusion that the offerors were essentially equal." *Id.* at 42:22–43:2.

The government asserts plaintiff's "argument that it is entitled to a strength for its proposed use of audiology vans is also meritless." Gov't Cross-MJAR at 21. Specifically, the government explains, "QTC received a strength because its 'approach to utilizing a mobile audiology solution that can be easily located to a noise free area, increases the accuracy, consistency, repeatability and reliability of the audiogram,'" while plaintiff "has failed to demonstrate that *its* proposed use of audiology vans necessarily 'will be advantageous to the Government,' and its proposal is materially different from QTC's." *Id.* (quoting AR at 13020, 12813) (emphasis in original). The government emphasized at oral argument that plaintiff's "propos[al] to conduct audiology testing in environments with unacceptable noise levels if that's

what the customer requests," undermined the veracity of plaintiff's "propos[al] to provide audiology vans any time a quiet space was not available at group events." Tr. at 43:9–19 (citing AR at 275). The government did not contest prejudice on this issue. Tr. at 56:2–8 ("[W]e haven't contested prejudice on this particular issue. . . . I'm not saying [plaintiff] would have won the award in that case, but there's at least a substantial chance I think.").

QTC explains the Army "did not determine that [plaintiff's] mobile audio unit proposal merited a strength" because it "understood that [plaintiff's] proposal offered use of mobile audio units as an alternative approach . . . not as a primary means to deliver its solution." Def.-Intervenor's Cross-MJAR at 16 (citing AR at 274). QTC argues the Army "reasonably recognized additional value in QTC's proposal to integrate 'mobile vehicle units' as a standard part of its services delivery." *Id.* at 15.

The Federal Circuit recently held in *WellPoint*, "to demonstrate unequal treatment, a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were substantively indistinguishable or nearly identical [to] those contained in other proposals or that the agency inconsistently applied objective solicitation requirements between it and other offerors." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1378 (Fed. Cir. 2020) (internal quotations omitted). Under subfactor 1 of the technical factor, the solicitation required offerors to "provide a narrative response describing their detailed and thorough technical approach to perform services for scenarios 1 and 2 that fall within the scope of the PWS." AR at 1286 (Solicitation). For Scenario 1, offerors were required to, among other things, "[d]escribe [their] approach to meeting the needs of" a location where "the event is being held in an ambient environment (eg. [sic] HVAC systems, gathering area, noise issues) and audio services are ordered." *Id.* Offerors could earn a strength when part of the proposal "exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance." *Id.* at 1242.

The government's decision can be understood as distinguishing plaintiff's proposal to "offer a mobile unit option" from QTC's proposal to "provide" mobile units. Tr. at 44:1–15; AR at 11250 (LHI Proposal), 10602 (QTC Proposal). As the government explained at oral argument, "if [plaintiff] had been proposing to provide audiology vans any time a quiet space was not available, actually provide them, not simply offer them, there would have been no need to conduct audiology tests with unacceptable noise levels." Tr. at 43:21–25. Instead, plaintiff offered to continue to provide services with unacceptable noise levels "[i]f that's what the customer requests." Tr. at 44:3–14 (citing AR at 11251). Notably, QTC does not propose to defer to a POC's decision to conduct testing in unacceptable conditions should the POC desire to do so. *See* AR at 10601–02, 10608. Plaintiff defends its proposal to defer to the POC as "just what any good contractor does. If the customer wants to move forward then you're going to move forward, but if the customer wants a van, you're going to provide a van." Tr. at 52:13–16. The government, however, is not bound to agree with plaintiff that this is good contracting practice, especially since plaintiff's understanding of "what any good contractor does" includes performance that plaintiffs' own proposal admits "can result in incorrect readings that may require additional testing and costs." AR at 11251.

The Court finds the government was not unreasonable in choosing to assign a strength to QTC's proposal to provide vans to ensure a low-noise environment but not plaintiff's proposal to perform audiology tests in unacceptable noise levels if the POC of a particular event desires such testing. *Ala. Aircraft Indus.*, 586 F.3d at 1375 ("Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'") (quoting *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43). As counsel for the government explained at oral argument, it was not "arbitrary and capricious for the agency to see a difference between these two proposals" when plaintiff proposed to "potentially perform these audiology services with unacceptable noise levels if that's what a particular POC at a particular event wants." Tr. at 55:9–20. Plaintiff has not met its high burden of establishing that its proposal was "substantively indistinguishable" from or "nearly identical" to QTC's proposal, as needed to prevail on its claim of unequal treatment. *See Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020). Plaintiff's comparison of the two proposals fails "to demonstrate unequal treatment" because plaintiff did not "'show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical [to] those contained in other proposals' or that 'the agency inconsistently applied objective solicitation requirements between it and other offerors.'" *WellPoint Mil. Care Corp.*, 953 F.3d at 1378; Tr. at 44:3–9. Additionally, because the strength rating is not in error, the source selection decision is also not in error. There were no flaws in the award process that would have rendered the source selection decision to be irrational because the Army properly evaluated the proposals. Accordingly, the Court finds the source selection decision to be reasonable. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.")

## C. Whether the Army Misevaluated QTC's Transition-In Plan

Under technical subfactor 3, "transition and quality assurance," the Army assigned QTC a "good" rating for its transition plan proposing to achieve authorization to proceed with the contract at [XXX] days after contract award ("DACA"). AR at 13252–53. In the part of its proposal titled "Volume I—Technical Subfactor III—Transition/Quality Assurance," QTC stated: "As a result of the significant IT work that Team QTC has already accomplished and will complete before contract award, we are confident in our ability to achieve the required security authorizations as early as within the first [X] months ([XXX] days) of the period of performance, as outlined in our Transition Plan." *Id.* at 10727. Later in the same part, in a subsection titled "1.1.2 IT Automation," QTC stated: "The government's stated requirement in the solicitation is that the contractor shall achieve ATO within 12 months of contract award—QTC intends to do better, achieving ATO within [XXX] days of contract award." *Id.* at 10729. QTC further notes the government's 6-month review process, which is included as part of QTC's [XXX]-day proposed timeline, can also be expedited "because of our [XXXXXXXXXXXXXXXXXXXXX XXXXXXXXX]," demonstrating QTC's proposal is optimistic about achieving a timeline even shorter than [XXX] days. *Id.* In a chart with a monthly timeline of events provided in the same section of its proposal, QTC sets the "ATO/Go Live" deadline at the end of "Month [X]." *Id.* at 10733. In a section of QTC's proposal titled "Volume III—Price/Cost—Price Matrix," QTC

stated: "We are very confident in our ability to achieve the required authorization(s) as early as within the first [XXXXX] months ([XXX] days) of the contract as outlined in our transition-in plan." *Id.* at 10832.

QTC identified its "critical path" to contract preparation as including "achieving authorization via" the government's Risk Management Framework ("RMF") because "RMF activities drive the transition timeline and the schedule for other [transition work breakdown structure] items which are linked to the ATO schedule." *Id.* at 10738. QTC outlined in its proposal security steps necessary for it to stay on schedule on the critical path. *Id.* These steps include: "security design, hardening the technical components to DISA standards, gathering necessary documentation, plans, processes and procedures, conducting testing, [and] identifying interfaces." Tr. at 64:12–17; AR at 10732–34. QTC created a detailed timeline with the processes occurring "[XXXXXXXXXXXXXXXXX]"—Phase I—and "immediately upon award"—Phase II. AR at 10732–34. [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]. *Id.* at 10732. QTC will primarily harden its technical components [XXXXXXXXXXXXXXXXX] to ensure security and will complete the sufficiently hardened system immediately upon award. *Id.* at 10732, 10734. Counsel for QTC stressed at oral argument QTC's experience working with these processes and its current robust infrastructures: "QTC understands this process, . . . their team has done it before, [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXX], and they have the plans and procedures and documentation in place. . . . They know how to do it[,] . . . they've got all the security hardening documentation, and [XXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXX]." Tr. at 65:13–20. QTC also observed in its proposal, despite staffing being "necessary to excel," the timeline for staffing is "not directly on the critical path," but instead "is determined based on the ATO critical path [XXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]. AR at 10738.

Regarding QTC's technical subfactor 3 rating, plaintiff argues "[t]he Army [] erroneously gave QTC a strength . . . for supposedly committing to meet a key transition milestone no later than [XXX] days after award, when in fact QTC said it would do so no earlier than [XXX] days after award." Pl.'s MJAR at 20 (emphasis omitted). According to plaintiff, this means the Army "entirely failed to consider an important aspect of the problem" and is thus irrational. *Id.* (quoting *Jacobs Tech., Inc. v. United States*, 100 Fed. Cl. 198, 206 (2011)). Plaintiff also asserts "QTC made a last-minute [XXXXXXXXXXXXXXXXXXXXXX] that should have put the Army on notice that any chance of QTC achieving ATO at [XXX] DACA was off the table—and that achieving ATO by 365 DACA was in jeopardy." *Id.* at 21. Plaintiff argues had the Army noticed these weaknesses, it "would have removed QTC's strength, assigned a significant weakness or deficiency, and downgraded QTC's Technical Subfactor 3 rating to Acceptable or worse." *Id.* at 22–23.

The government argues, "QTC did, in fact, propose to complete its transition within [XX XXX] months of contract award, including obtaining the required ATO." Gov't Cross-MJAR at

23.  The government notes QTC's "Transition Plan Major Activities Timeline" "shows QTC obtaining the required ATO by the end of month [XXXXX]," and "QTC also expressly stated that it 'proposes to obtain ATO by the end of Month [X].'"  *Id.* (citing AR at 10733, 10727). The government acknowledges QTC stated it is "confident in [its] ability to achieve the required security authorizations as early as within the first [X] months ([XXX] days) of the period of performance."  *Id.*  According to the government, "[i]n context, the 'as early as' language indicates achieving ATO within [XXXXX] months is not entirely within QTC's control, because QTC's system is subject to *Government* testing and approval."  *Id.* (citing AR at 10726) (emphasis in original).  The government emphasized, "QTC committed to having its system ready for Government testing within [XXX] months of contract award," and, because the PWS estimates "six months for Government testing and review, the Government had no reason to doubt that QTC would complete transition within [XXXXX] months."  *Id.* at 23–24 (citing AR at 10727, 1180).  Regarding plaintiff's [XXXXXXXX] argument, the government explains QTC's proposed [XXXXXXXXXXXXXXXXX] was not necessary to obtain ATO—"[r]ather, QTC stated that its [XXXXXXXXXXXXXXXXX] was based upon the recognition that it would likely take [XXXXX] months to achieve ATO, which was necessary to begin full performance." *Id.* at 24–25.  The government notes "QTC's proposal indicated that its ability to achieve ATO within [XXXXX] months after contract award was due primarily to work [XXXXXXXXXXXXX XXXXX] with [XXXXXXXX] resources, not its post-award [XXXXXXXXXXXXXXXXXXX]. *Id.* at 25.[3]

QTC argues it "clearly proposed to expedite the security authorization process to completion within [XXX] days (*i.e.*, [XXXXX] months)," and a "fair reading of [its] proposal makes clear that [it] proposed to achieve the security authorization within its [XXX]-day proposed timeline."  Def.-Intervenor's Cross-MJAR at 20 (citing AR at 10726), 21.  QTC also notes it "plainly stated that it would complete its portion of the preparation within [XXX] months of the contract start date" and "explained that, consistent with the RFP, it assumed six months for the Government's full security authorization process."  *Id.* at 22.[4]  Regarding plaintiff's [XXXX XXXX] argument, QTC explains plaintiff "fails to recognize that QTC did not propose to [XXX

---

[3] In support of the argument QTC's staffing delays will not affect QTC's timeline for achieving ATO, the government also cites the following from QTC's proposal:  "teams are [XXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXX] . . . outlined for RHRP-3."  Gov't Cross-MJAR at 25 (citing AR at 10712) (internal quotation marks omitted) (emphasis added in government's brief); "As a result of the significant IT work that [XXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX], we are confident in our ability to achieve the required security authorization as early as within the first [X] months ([XXX] days) of the period of performance. . . .  The IT solution that QTC proposes for RHRP-3 [XXXXXXXXXX XXXXXXXXXXXXX] and delivering services to federal government organizations today."  *Id.* (citing AR at 10727) (internal quotation marks omitted) (emphasis added in government's brief).
[4] QTC also quotes specifically from its proposal:

Our solution architecture, hardened security posture, and [XXXXXXXXXXXXXXXXXXXXXX] provides to the government a system that is *ready for testing within* [X] *months (*[XX] *days) of the contract start date*.  QTC assumes approximately 6 months for the full security authorization process, including [XXXXXXXXXXXXXXXX XXXXX] contents and [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX] independent verification [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX], results and package review, and granting of the ATO.

Def.-Intervenor's Cross-MJAR at 22 (quoting AR at 10726) (emphasis in QTC's brief).

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXX].'" *Id.* at 24.  According to QTC, plaintiff's argument incorrectly supposes
the inverse of QTC's plan, specifically that "QTC's ATO timeline is dependent on [XXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXX]." *Id.* at 27.  QTC instead notes, "the work to achieve
ATO [XXXXX] months after award had [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXX]." *Id.* (emphasis in original).  QTC explained "its solution [to achieving ATO] is
'already in place and functional for federal use,'" but "that solution 'needs to be hardened to
DoD and DHA security standards.'" *Id.* at 25.  Rather than needing to [XXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]," while [XXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX].
*Id.* at 26–27 (citing AR at 10738–39).

For technical subfactor 3, transition and quality assurance, the RFP instructed offerors to
describe, among other things, "[t]he processes and timelines from inception to full
implementation," "a detailed flow schedule that includes all activities required from inception of
award through commencement of procedure services[,]" and the "[t]ransitioning of applicable IT
systems, data, databases, software and services."  AR at 1288.  The flow schedule was required
to "clearly identify the critical path and all tasks."  *Id.*  The RFP required the Army to evaluate
"the Offeror's methods and approach to meeting the requirements in a timely manner," and
assess whether "the Offeror is expected to be able to successfully complete the services to meet
the requirements of the PWS."  *Id.* at 1240.  A key transition milestone is the contractor's ATO
for information systems networks, which the RFP required the contractor to achieve by 365 days
after contract award.  *Id.* at 1288; *see also* 1179.

Plaintiff offers two related objections to the government's assignment of a "good" rating
to technical subfactor 3 for QTC's proposed transition plan:  (1) plaintiff disputes whether QTC
actually proposed to complete its transition within [XXX] days; and (2) plaintiff believes the
government "never considered what effect QTC's significant [XXXXXXXXXXXXX] would
have on its ability to" meet the transition deadline, meaning the government "failed to consider
an important aspect of the problem."  Pl.'s MJAR at 21–22 (citing *Jacobs Tech.*, 100 Fed. Cl. at
206); Tr. at 68:19–69:12.  At oral argument, counsel for the government acknowledged QTC
said it would complete the transition in "as early as" [XXX] days "in a couple of places," but
explained the government understood this to be QTC's recognition of the government's role in
contributing to achieving the [XXX]-day timeline.  Tr. at 69:24–70:4.  The government cited the
"lengthy government review process" covering "the majority of that [XXXXX] months" QTC
proposed in its timeline as evidence QTC intended to propose to, and can deliver on, its part of
the [XXXXX]-month timeline.  *Id.* at 70:3–11.  Counsel for QTC explained at oral argument,
"QTC will have its part of the process, its authorization package, done by the end of [XX] days,

and be ready for testing at the end of [XX] days, which means if the [g]overnment performs its part of the work in [XXX] months, . . . this process will be done at the end of month [XXXXX]." *Id.* at 71:22–72:4.

When asked what plaintiff specifically disputed regarding QTC's proposed timeline of [XX] days followed by six months for the government's security authorization for a total of an [XXXXX]-month transition, counsel for plaintiff explained, "to try to put it simply, . . . the transition plan that's presented in [QTC's proposal] is outdated because it does not account for the [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]. *Id.* at 76:4–6, 77:20–22. Counsel for plaintiff argued QTC's transition approach presented beginning at AR 10726, QTC's proposal dated 3 July 2019, is outdated because QTC proposed an updated and final reduced-cost proposal on 12 November 2019, and "[t]hat price revision says, hey, we're [XXXXXXXXXXXXXXXXXXXXXX X]" but "it never goes back and issues or submits an updated version of that July 3rd document. So there's nowhere where QTC ever explains to the Government, here's what the [XXXXXXXX X] is, here's how it [XXXXXXXXXXXXX]—affects transition or doesn't affect transition." *Id.* at 77:3–18. Plaintiff here collapses its first argument into its second, as its explanation for why the government was irrational in crediting QTC's [XX]-day start to the [XXX]-day proposed transition plan rests on its argument the plan does not account for QTC's later [XXXXXXXXXX XXXXXXXXXXXXXXX] for its final reduced cost proposal. *See id.* Plaintiff provides no other reason for the Court to find the government irrational in crediting QTC's proposed transition time; thus, the Court will consider plaintiff's argument regarding QTC's proposal to reduce costs by [XXXXXXXXXXXXXXXXXXXXXXXX] as a necessary premise in its argument against QTC's "good" rating. *See* Tr. at 77:19–22 (plaintiff's counsel arguing "the transition plan [QTC] presented . . . is outdated because it does not account for [XXXXXXXXX XXXXXXXXXXXXX].").

Counsel for the government acknowledged at oral argument, "QTC made an adjustment to its [XXXXXXXXXXXXXXXX] in its final proposal revision" but also noted QTC's 12 November 2019 final proposal revision stated: "[QTC] remain[s] fully dedicated to [its] solution for RHRP-3 and there are no changes to the technical approach from the July 3, 2019 proposal submission." Tr. at 61:18–19, 79:22–80:5; AR at 11609. Counsel for the government also noted QTC's final proposal revision stated it merely "adjusted the [XXXXXXXXXXXXXXXXXXXXX XXXXX] of the same total [XXXXXXXXXXXXXXX] to be more efficient," which QTC is able to do because of its "[XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]." Tr. at 80:6–12; AR at 11628. This specific language from QTC's 12 November 2019 final proposal revision undermines plaintiff's argument QTC "never goes back and issues or submits an updated version of that July 3rd document. So there's nowhere where QTC ever explains to the Government, here's what the [XXXXXXXXX] is, here's how it [XXXXXXXXXXXXX]—affects transition or doesn't affect transition." Tr. at 77:13–18. Contrary to plaintiff's assertion, QTC explained there will be no effect on transition: "We remain fully dedicated to our solution for RHRP-3 and there are no changes to the technical approach from the July 3, 2019 proposal submission." AR at 11609. Additionally, the government observed at oral argument: "[t]ransition is a firm fixed price element of this contract, so QTC will be required to meet the requirements of a PWS at the price it proposes . . . regardless of whether that means they have to have [XXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXX]. Tr. at 70:12–15. The government concluded at oral argument that QTC's explanation means the government could continue to take QTC's "subfactor 3 proposal at face value that it could . . . complete transition within [XXXXX] months." *Id.* at 80:13–17.

QTC's final proposal's promise that the [XXXXXXXX] change does not change its [XX XXX]-month transition timeline is supported by the substance of its proposed transition: "Our solution architecture, hardened security posture, and [XXXXXXXXXXXXXXXXXXXXXX] provides to the government a system that is ready for testing within [X] months ([XX] days) of the contract start date," which is possible because "QTC's [XXXXXXXXXXXXXXXXXXXXX] effectively trim [X] months off the transition timeline." AR at 10726. Counsel for QTC explained at oral argument such [XXXXXXXXXXXXXXXXXXXXX] are "obviously . . . being done [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXX]," indicating a streamlined transition process. Tr. at 78:9–11.

The Court finds the Army's evaluation of a strength for QTC's transition plan to be rational because it did not "entirely fail[] to consider an important aspect of the problem"; rather, the government noted QTC's promise that its cost and [XXXXXXXXXXXXXXXXXXX] would not negatively affect its proposed accelerated transition time. Tr. at 80:13–17; *Ala. Aircraft Indus.*, 586 F.3d at 1375 (internal citation and quotation marks omitted); *Jacobs Tech.*, 100 Fed. Cl. at 206. The government is correct plaintiff "provides no basis to question [the] assignment of a strength to QTC's proposal to obtain ATO and complete the transition within [XXXXX] months of contract award." Gov't Cross-MJAR at 25. The government was reasonable in crediting QTC with a strength for an accelerated transition time because QTC communicated the role its existing staff and [XXXXXXXXXXXXXXXXXXXXXX] would play in preparing for transition within the first [XX] days of contract start date. AR at 10726; *Ala. Aircraft Indus., Inc.-Birmingham*, 586 F.3d at 1375. The government additionally was not irrational in crediting QTC with proposing an [XXXXX] month transition plan despite QTC's language "as early as [[XXXXX] months]" because QTC provided a detailed plan for achieving the transition in [XXX XX] months and explained the final six of the [XXXXX] months in the transition would depend on government involvement. AR at 10726–27, 10729, 10732–34; *Ala. Aircraft Indus., Inc.-Birmingham*, 586 F.3d at 1375.

### D. Whether the Overall Technical Evaluation Was Adequate

Plaintiff argues "the record shows that the Army's technical evaluation ignored the majority of criteria that it was required to consider," failing the RFP's requirement for "the Army to evaluate proposals against the major requirements of the entire PWS." Pl.'s MJAR at 23. Plaintiff asserts the government must comply with the FAR's "require[ment] that a 'source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against *all source selection criteria* in the solicitation.'" *Id.* (quoting FAR 15.308 (emphasis added in plaintiff's brief)). According to plaintiff, the Army's evaluation of plaintiff's "technical proposal comprises just 18 pages spread across four documents," and "[o]nly about 8 of those pages actually discuss the proposal." *Id.* at 23–24 (citing AR at 2455–57, 2458–63, 2464–67, 2468–72). Plaintiff notes the Army's "evaluation of QTC's technical proposal is less than 22 pages spread across four documents," and "[o]nly about 9 of those pages actually discuss the

proposal." *Id.* at 24 (citing AR at 12806–07, 12810–14, 12817–18, 12821–22).  Plaintiff also complains the Army "ignored the vast majority of material requirements in the PWS," including "the training and licensure requirements for providers" and "the contractor's vaccine supply chain." *Id.* at 25 (citing AR at 1144–46, PWS § 2.8; *id.* at 1150-51, PWS § 2.14).  Plaintiff argues it was prejudiced by the government's allegedly "inadequate evaluation" because the government would have recognized plaintiff's additional technical strengths and QTC's weaknesses, establishing "a substantial chance that the Army would have been willing to pay a small premium for [plaintiff's] technical superiority." *Id.* at 25–26.

The government responds, "neither the FAR, nor the solicitation, required DoD to document offerors' understanding of and expected compliance with every PWS requirement." Gov't Cross-MJAR at 28.  According to the government, "[i]f a PWS requirement was not directly addressed in a technical subfactor evaluation, it was either because that PWS requirement was not relevant to the particular subfactor or because DoD did not deem the offeror's approach to that particular PWS requirement to merit a strength, weakness, or deficiency." *Id.*  The government notes "[t]he FAR requires that the 'relative strengths, deficiencies, significant weaknesses, and risks supporting proposal evaluation shall be documented in the contract file.'" *Id.* at 25 (quoting FAR 15.305(a)).  The government also notes "[t]he FAR also requires an 'assessment of each offeror's ability to accomplish the technical requirements' and a 'summary, matrix, or quantitative ranking, along with appropriate supporting narrative, of each technical proposal using the evaluation factors.'" *Id.* at 25–26 (quoting FAR 15.305(a)(3)).  The government emphasized:  "The solicitation required the agency to evaluate offerors' understanding of the PWS requirements and the feasibility of their approaches through the prism of three technical subfactors:  1) two specific technical scenarios for the delivery of particular RHRP services; 2) management and staffing; and 3) transition and quality assurance." *Id.* at 26 (citing AR at 1239–40, 1248–56, 1286–88).  The significance of this, the government asserts, is that "DoD would evaluate offerors against the PWS requirements as relevant to each of the technical subfactors, not on an itemized basis." *Id.* at 27.  The government's reply brief also notes prior Court of Federal Claims case law finding, according to the government:  "[n]either the FAR nor the solicitation required DoD to document each offeror's understanding of and expected compliance with every PWS requirement that was relevant to every subfactor, where the offeror demonstrated an adequate understanding and a feasible approach." Gov't Reply at 9 (citing *Telos Corp. v. United States*, 129 Fed. Cl. 573, 577 (2016) (Wolski, J.)).

QTC argues plaintiff's "complaints regarding the adequacy of the evaluation are based on a distortion of the RFP and cannot be supported." Def.-Intervenor's Cross-MJAR at 27.  QTC explains the RFP does not "promise a check-the-box evaluation of the proposal *versus* each and every PWS requirement.  Instead, 'the solicitation established technical scenarios as a technical evaluation subfactor, through which the agency would be able to evaluate offerors' understanding of, and approach to, the PWS requirements.'" *Id.* (quoting GAO Advisory Op. at 9) (emphasis in QTC's brief).  QTC cites Court of Federal Claims case law "recogniz[ing] that 'when an agency is not finding fault with a particular approach to a task, or noting its superior quality, the Court cannot see how the agency should be required to explain its finding—that the approach is merely adequate—in any detail.'" *Id.* at 29 (quoting *InSpace 21 LLC v. United States*, 128 Fed. Cl. 69, 89 (2016) (Wolski, J.)).

QTC also notes plaintiff "filed pre-award protests with the Agency and GAO complaining about the narrowness of the RFP's evaluation scenarios—and seeking a revision to the RFP that would 'require offerors to propose a comprehensive technical solution for the full set of requirements under the PWS, and to provide that the agency will evaluate each offerors [sic] ability to meet those requirements.'" *Id.* at 27–28 (quoting AR at 2718–22). QTC explains the government "took corrective action and revised the scenarios, but it did not incorporate into the RFP an evaluation scheme requiring the documentation of the Agency's examination of each and every PWS provision against each proposal," as plaintiff had requested. *Id.* at 28.

When an agency selects one offer among many, that exercise of discretion is scrutinized to ensure the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983) (citation omitted); *see also Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 396 (2005) (Wolski, J.) (applying the standard established in *Balt. Gas & Elec.*). "Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. §706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). The FAR requires the "relative strengths, deficiencies, significant weaknesses, and risks supporting proposal evaluation . . . be documented in the contract file." FAR 15.305(a). It also requires an "assessment of each offeror's ability to accomplish the technical requirements" and a "summary, matrix, or quantitative ranking, along with appropriate supporting narrative, of each technical proposal using the evaluation factors." FAR 15.305(a)(3).

The solicitation included two "technical scenarios" by which the government judged the offerors' proposals. *See* AR at 1248. The technical scenarios were the most important subfactor within the technical factor, and the technical factor was the most important factor. *Id.* at 1238. The solicitation notes the government's evaluation "will assign an adjectival rating and write a narrative evaluation reflecting the identified findings," and "[t]he result will be a determination of the overall merits of each proposal in terms of its potential to best satisfy the needs of the Government." *Id.* at 1239. For each technical subfactor, the solicitation required the Army to evaluate a proposal's "Understanding of the Requirements," meaning "[t]he extent to which the proposal demonstrates a clear and complete understanding of the requirements in the [PWS]" and "Feasibility of Approach," meaning "the extent to which the Offeror is expected to be able to successfully complete the services to meet the requirements of the PWS." *Id.* at 1240. The solicitation stated the technical factor ratings will "focus on the significant strengths, strengths, deficiencies, significant weaknesses, and risks of the Offeror's proposal," and "[e]ach Subfactor will be assessed for significant strengths, strengths, significant weaknesses, weaknesses, deficiencies, risks [], and uncertainties." *Id.* Technical subfactor 1, Scenario 1 requires offerors to "include at a minimum the following: staffing (shall list the labor mix, hours, labor category and procedure), movement/shipping of technical/medical equipment, travel, IT support, scheduling/coordination of services for the service members and the handling of vaccines (to include shipping and cold chain maintenance process) for both surge weekends." *Id.* at 1286.

In a 2016 case before this court, *InSpace 21*, Judge Wolski found, "when an agency is not finding fault with a particular approach to a task, or noting its superior quality, the Court cannot see how the agency should be required to explain its finding—that the approach is merely adequate—in any detail." *InSpace 21*, 128 Fed. Cl. at 89. This is because "[n]o statute or regulation requires such a process, which would impose high transactions costs on the government with little added benefit." *Id.* Judge Wolski also explained, "it is not arbitrary for an agency to not provide detailed explanations of the reasons an approach is adequate, unless this subjective judgment can be shown to be inconsistently reached." *Id.* In a later 2016 case, *Telos Corporation*, Judge Wolski acknowledged the government must follow "the evaluation factors and criteria announced by the agency" and "[f]or negotiated procurements, the FAR requires a certain level of documented analysis of 'relative strengths, deficiencies, significant weaknesses, and risks, . . . which may be mined by protestors for prejudicial errors or inconsistencies." *Telos Corp.*, 129 Fed. Cl. at 577 (citing FAR 15.305(a); FAR 15.305(a)(3)). Judge Wolski rejected plaintiff's position, however, "that a protester can unilaterally impose upon an agency the duty to explain why any feature in its proposal was not found to be a strength, merely by disputing this determination." *Id.* This "concept is unprecedented, because it would shift the focus of bid protests far from the review of the actual procurement decision and, hence, depart from the APA review standard." *Id.* Judge Wolski then found: "the notion that when an agency finds aspects of a protester's proposal to be adequate, and thus not material to the best value determination, each adequacy determination must nevertheless be explained for the award decision to be rational, has no basis in law or reason. Such an approach is not even required in . . . negotiated procurements." *Id.* This means "the [government] decision that must be reasonably articulated and supported in a post-award bid protest is the selection of the awardee, not every 'decision' that a proposed feature is unremarkable." *Id.*

Counsel for plaintiff summarized at oral argument: "the agency failed to evaluate key aspects of the proposals, and consider key aspects of the problem before making an award decision." Tr. at 84:9–12. Counsel for the government noted, "all that's required" for the agency to demonstrate it "evaluated proposals in accordance with the solicitation's criteria" is for the government to "document[] its evaluation in accordance with FAR 15.305(a), focusing on strengths, weaknesses, risks and deficiencies." *Id*. at 84:14–19. As the government asserts, it complied with the FAR requirements and "summarized the offerors' technical approach, explained any strengths, weaknesses, risks, and deficiencies, and assigned an adjectival rating in accordance with the solicitation's evaluation criteria." Gov't Cross-MJAR at 26 (citing AR at 1641–58, 2007–22, 2458–72, 12185–00, 12458–74, 12808–22, 13181–88, 13245–60). Plaintiff asks the Court to apply a more searching level of inquiry into the award than is appropriate by asking for "the Army to evaluate proposals against the major requirements of the entire PWS." Pl.'s MJAR at 23. Rather, "the [government] decision that must be reasonably articulated and supported in a post-award bid protest is the selection of the awardee, not every 'decision' that a proposed feature is unremarkable . . . ." *Telos Corp.*, 129 Fed. Cl. at 577.

Plaintiff complains the Army "ignored the vast majority of material requirements in the PWS," including "the training and licensure requirements for providers" and "the contractor's vaccine supply chain." Pl.'s MJAR at 25. Plaintiff offers the following conclusory explanation for why it was prejudiced by the government's failure to discuss its considerations of these requirements:

> Had the Army evaluated the offerors' proposals against the PWS requirements as required, it would have recognized numerous strengths in LHI's technical proposal, including its existing network of trained and credentialed providers, and its sophisticated and comprehensive approach to vaccine logistics. And it would have realized that QTC lacks an understanding of—and feasible approach to—many of the PWS requirements.

*Id.* at 25–26. In short, plaintiff asserts the government's failure to give offerors ratings plaintiff believes they should have received is itself proof the government failed to adequately consider proposals. Counsel for plaintiff confirmed this position at oral argument, stating the government's evaluation was flawed "because there's no contemporaneous record before the Court showing that the agency ever evaluated the vaccine supply chain management." Tr. at 88:21–24. According to plaintiff's counsel, vaccine supply chain management "is a significant enough issue that if the agency had evaluated it, it would have addressed it." Tr. 89:11–15. This approach proceeds under what Judge Wolski decried in *Telos Corp.* as "the notion that when an agency finds aspects of a protester's proposal to be adequate, and thus not material to the best value determination, each adequacy determination must nevertheless be explained for the award decision to be rational," an approach to evaluating government procurement decisions Judge Wolski found "has no basis in law or reason." *Telos Corp.*, 129 Fed. Cl. at 577. As counsel for the government explained at oral argument, "the agency simply didn't . . . either take issue or find a strength with regard to vaccine management," for example. Tr. at 87:21–23. Rather, the government notes, and the Court agrees, "the agency documented its evaluation and documented the overall approach of the offerors and the specific strengths and weaknesses that it found, and used that narrative and those strengths . . . to determine the various ratings . . . for the offerors." Tr. at 87:23–88:4. The Court accordingly finds the government complied with the FAR requirement to "document[] in the contract file" "relative strengths, deficiencies, significant weaknesses, and risks supporting proposal evaluation"; thus, plaintiff fails to provide a basis for its assertion the government's overall evaluation was "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" FAR 15.305(a); *Banknote Corp. of Am.*, 365 F.3d at 1350–51. Plaintiff's argument it was prejudiced by the government's alleged errors similarly fails because plaintiff has not established the government was in error and thus has not established "a substantial chance that the Army would have been willing to pay a small premium for [plaintiff's] technical superiority." Pl.'s MJAR at 26. The government and QTC also offer *Blue & Gold* arguments against plaintiff's complaint regarding the adequacy of the overall evaluation. Although the Court finds for the government and QTC here, the Court will alternatively address all *Blue & Gold* arguments *infra*.

## V.   Whether the Army's Conduct of Discussions Was Equal

Plaintiff explains, "before making the first award to QTC, the Army gave QTC six chances to revise and improve its proposal while allowing [plaintiff] just four." Pl.'s MJAR at 27. According to plaintiff, these discussions resulted in the government changing weakness ratings into strengths for QTC, and the government allowed QTC a seventh discussion during corrective action following outcome prediction ADR at the GAO, during which "QTC was allowed to transform its fatally deficient proposal into an award-winner while [plaintiff] was

given no opportunity whatsoever to improve its proposal." *Id.* at 28.  Plaintiff argues this "repeatedly violated" the "basic rule[]" requiring "that an agency may not give one offeror multiple opportunities to improve without giving other offerors the same chance." *Id.* at 26. Plaintiff asserts the government's decision to take corrective action after the GAO determined the government failed to previously inform QTC of a deficiency in its solicitation "is fundamentally unfair" because the government did not also give plaintiff a chance to improve its proposal. *Id.* at 29.

Plaintiff also cites two cases from this court for the proposition, "if an agency holds or reopens discussions with one offeror, it must do so with all offerors whose proposals are in the competitive range." *Id.* at 26 (citing *Centerra Grp., LLC v. United States*, 138 Fed. Cl. 407, 416 (2018); *Dynacs Eng'g Co. Inc. v. United States*, 48 Fed. Cl. 124, 130 (2000)).  Plaintiff notes the court in *Centerra* found, "conducting discussions only with the putative awardee in response to a bid protest is unlawful and makes 'a mockery of fundamental fairness and competitive principles.'" *Id.* at 28 (citing *Centerra*, 138 Fed. Cl. at 416).  According to plaintiff, "[a]s in *Centerra*, the Army's corrective action allowed the awardee to fix its proposal without giving [plaintiff] any chance at all to improve its competitive standing," when if "[g]iven the same opportunities and guidance QTC received, [plaintiff] likely would have lowered its price significantly and improved its proposal in other ways, thereby giving it substantial chance of award." *Id.* at 29 (citing *Centerra*, 138 Fed. Cl. at 416).

The government argues its "discussions were tailored to each offeror, as required by the FAR," and it "was not required to hold extra rounds of discussions with [plaintiff] when [plaintiff] had no further deficiencies or significant weaknesses to discuss." Gov't Cross-MJAR at 36; *see* Tr. at 98:17–22 ("[T]his in no way favors QTC over [plaintiff], it's treating them equally by tailoring discussions to the specific issues in each of their proposals as required by, or at least as directed by 15.306(d)(1), which provides that discussions are tailored to each offeror's proposal.").  The government notes several GAO decisions in which an agency "re-open[ed] discussions with only one offeror as part of a corrective action."  Gov't Cross-MJAR at 40 (citing *Environmental Chem. Corp.*, B-416166.3, et al., 2019 CPD ¶ 217, at *20–21 (Comp. Gen. June 12, 2019); *Peraton, Inc.*, B-416916.5, et al., 2020 CPD ¶ 144, at *7–9 (Comp. Gen. Apr. 13, 2020).  The government explains, "[t]his places the offeror receiving discussions about the newly identified significant weaknesses or deficiencies on a level playing field with the other offerors, who had already received meaningful discussions." *Id.* (citing *Environmental Chemical*, 2019 CPD ¶ 217, at *21).

The government also notes the Court of Federal Claims has previously gone "so far as to *order* the Government to conduct discussions with *only* one offeror during a corrective action, when the Court determined that this was necessary to correct the agency's error and prevent the other offers from gaining an unfair advantage." *Id.* at 41 (citing *Caddell Construction Co. v. United States*, 125 Fed. Cl. 30, 55–57 (2016)).  The government asserts plaintiff states it likely would have lowered its price significantly because plaintiff "learned QTC's price and factor ratings after the first award and before the corrective action, so [plaintiff] knew that it lost the competition primarily because of its higher price." *Id.* at 42–43 (internal citation omitted). According to the government, "[a]llowing [plaintiff] to make unfettered proposal revisions during the corrective action, despite having no remaining weaknesses or deficiencies, would

effectively punish *QTC* for *DoD's mistake* in failing identify the QTC program manager deficiency during the initial pre-award discussions." *Id.* at 43. The government argues *Centerra* is distinguishable from this case because: (1) "the *Centerra* decision does not indicate that the agency assessed any new significant weaknesses or deficiencies in the awardee's proposal during the corrective action"; and (2) "the agency in *Centerra* was not trying to correct the failure to provide meaningful discussions to the awardee." *Id.* at 43 (citing *Centerra*, 138 Fed. Cl. at 416–18; FAR 15.306(d)(3)). The government finally argues, even if it "erred by not also offering [plaintiff] the opportunity to substitute its program manager," plaintiff "has not demonstrated that a new program manager would have improved its proposal." *Id.* at 44.

QTC argues plaintiff's claim "does not implicate the content of any discussion items," and instead "boils down to an argument that discussions are *per se* improper and 'unequal' if an agency holds a different number of discussion rounds with offerors." Def.-Intervenor's Cross-MJAR at 30. Plaintiff "cites no authority" for this proposition, QTC argues, "which would be inconsistent with the FAR mandate that discussions are to be 'tailored to each offeror's proposal,'" as well as the FAR rule an agency must give a common cutoff "only for receipt of final proposal revisions." *Id*. (citing FAR15.306(d)(1); FAR 15.307(b)). QTC further explains: "[i]f the number of rounds and proposal revisions needed to be common, there would not be any need for such a statement specific to final proposal revisions." *Id.* QTC finally notes the FAR "provides that the 'scope and extent of discussions are a matter of contracting officer judgment.'" *Id.* at 29 (quoting FAR 15.306(d)).

QTC asserts there is "no genuine question that, as part of its corrective action, the Agency was permitted to raise the PM deficiency with QTC in discussions." *Id.* at 31. This is because the Army "found that it erroneously had not considered QTC's proposed PM to be a deficiency and, thus, had not had any discussions on the point." *Id.* QTC explains the GAO previously found "an agency may conduct discussions with only one offeror in the course of taking corrective action in response to an outcome prediction by GAO." *Id.* at 31–32 (citing *Peraton, Inc.*, B-416916.5, Apr. 13, 2020, 2020 CPD ¶ 144). QTC further noted the GAO elsewhere found "conduct[ing] discussions with only one offeror . . . to address concerns the agency had not previously addressed in discussions . . . merely would place" the offeror "'in the same competitive position' as the other offerors with whom discussions had been held on all relevant issues." *Id.* at 32 (citing *Environmental Chemical Corp.*, B-416166.3, *et al.*, June 12, 2019, 2019 CPD ¶ 217 at 21).

"[C]ontracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citation omitted). This Court may set aside a contract award when plaintiff alleges "the procurement procedure involved a violation of regulation or procedure," but "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Id.* at 1332–33 (citation omitted). The Federal Circuit has "consistently reviewed agencies' corrective actions under the [APA's] 'highly deferential' 'rational basis' standard." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018). "The scope and extent of discussions are a matter of contracting officer judgment," and discussions must be "tailored to each offeror's proposal." FAR 15.306(d)(3), 15.306(d)(1). Contracting officers are required to "indicate to, or discuss with, each offeror still

being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond," but "the contracting officer is not required to discuss every area where the proposal could be improved."  FAR 15.306(d)(3).

The FAR states:

> The contracting officer may request or allow proposal revisions to clarify and document understandings reached during negotiations.  At the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision.  The contracting officer is *required to establish a common cut-off date only for receipt of final proposal revisions*.  Requests for final proposal revisions shall advise offerors that the final proposal revisions shall be in writing and that the Government intends to make award without obtaining further revisions.

FAR 15.307(b) (emphasis added).  As a fundamental principle, the FAR establishes: "prospective contractors shall be treated fairly and impartially but need not be treated the same."  FAR 1.102-2(c)(3).  The government stated it "intends to award with discussions as described in Federal Acquisition Regulation (FAR) 15.306(d); however, the Government reserves the right to award without conducting discussions should it be determined to be in the Government's best interest.  Therefore, the initial proposed prices shall represent best and final prices."  AR at 1238.

At oral argument, counsel for the government outlined the timeline of pre-award evaluation notices it provided to the offerors, explaining it provided such notices in February 2019 and June 2019 when it informed the parties of their weaknesses and deficiencies and provided the parties the opportunity to correct them.  Tr. at 97:23–98:8.  QTC received additional opportunities to address deficiencies the government noticed in its July 2019 small business proposal revision, which QTC addressed through minor changes in August 2019.  *Id.* at 98:9–13; *see also id.* at 110:13–23.  Both parties were then "permitted to submit a final proposal revision in November 2019 . . . and make whatever changes they wanted to at that time."  *Id.* at 98:14–16.  The government observed any changes plaintiff hoped to have made to its proposal when QTC made its August 2019 changes, plaintiff could have later made in its November 2019 final revision, but it "simply chose not to make significant changes."  *Id.* at 98:23–99:4.  Counsel for plaintiff argued at oral argument the extra opportunity the government granted QTC to address a deficiency violates "a fundamental fairness requirement that's in FAR 15.306."  *Id.* at 107:25–108:6.  Counsel for QTC noted "[t]here's no requirement in the FAR to hold the same number of discussions with each offeror, and that would actually be inconsistent with the requirements that they tailor discussions."  *Id.* at 111:22–25.  Counsel for plaintiff agreed with counsel for QTC, stating such a requirement "is not" in the "specific language" of the FAR.  *Id.* at 113:14–18.

Contracting officers are required to "indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond," but "the contracting officer is not required to discuss every area where the proposal could be improved."  FAR 15.306(d)(3).  By conducting discussions with offerors to address their weaknesses and

deficiencies, the government is correct it acted in a fashion "tailored to each offeror's proposal." FAR 15.306(d)(1). The government conducted its pre-award discussions with offerors when they had outstanding deficiencies, but the government was not required to grant plaintiff the opportunity to "discuss every area where the proposal could be improved." FAR 15.306(d)(3); *see also* FAR 1.102-2(c)(3) ("prospective contractors shall be treated fairly and impartially but need not be treated the same"). This Court may set aside a contract award if "the procurement procedure involved a violation of regulation or procedure[,]" but "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Domenico Garufi*, 238 F.3d at 1332–33. Regarding the government's corrective action discussion with QTC, counsel for the government observed at oral argument, "[t]his Court's decision in *Caddell*, as well as the GAO's decision in *Environmental Chemical*, *Peraton*, not to mention the advisory opinion in this very case, all recognize that agencies may reopen discussions during corrective action with only one offeror in certain circumstances." Tr. at 99:9–14. Those circumstances include, according to counsel for the government, "when the agency failed to . . . notify [the] offeror of a weakness or deficiency in its proposal during the pre-award discussions." *Id.* at 99:14–18.

While the government has discretion in conducting discussions with offerors, it "must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR 15.306(d)(3). "'An agency may not inadvertently mislead an offeror, through the framing of a discussion question, into responding in a manner that does not address the agency's concerns; or that misinforms the offeror concerning its proposal weaknesses or deficiencies; or the government's requirements.'" *Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. 34, 48 (1997) (internal citation omitted). At outcome prediction ADR, the GAO announced a deficiency the Army had not previously informed QTC of when the Army awarded QTC an "acceptable" rating for in the relevant category. AR at 241–42, 475. To allow QTC to be "permitted the opportunity to address this deficiency during the discussion process," the Army issued an evaluation notice and allowed QTC to revise its proposed program manager through corrective action. *Id.* at 12136. This means the corrective action plaintiff objects to originated in the government's mistake in not identifying QTC's weakness before final proposals and award decision, rather than any action of QTC. Plaintiff's objection to the government's corrective action raises an apparent conflict between the fairness associated with ensuring finality in final proposals and the fairness associated with allowing parties to correct errors in proposals the government should have noticed before final proposals and award. Plaintiff's request to be allowed to lower its price itself raises additional fairness concerns because: (1) plaintiff has now seen that QTC's final price was slightly lower than its price and that QTC had similar technical ratings; and (2) QTC was only allowed to update the deficiency related to its proposed program manager during corrective action—it was not allowed to update its price proposal—yet plaintiff asks to adjust its price, not replace its program manager. The Court must address how these various concerns relate to one another.

In *Caddell*, this court "recognize[d] that typically when discussions are reopened with one offeror, they should be reopened with all offerors." *Caddell Constr.*, 125 Fed. Cl. at 34. The court found in *Caddell*, however, "two circumstances taken together militate[d] against" reopening discussions with all offerors. *Id.* First, in *Caddell* "the misleading discussions only

affected the awardee's pricing," while the "other offerors received accurate information and had an opportunity to submit informed revised offers." *Id.* In this procurement, the government directed its corrective action only to QTC because the government's error in failing to notice QTC's deficient program manager "only affected the awardee," while plaintiff "received accurate information [on the sufficiency of its program manager] and had an opportunity to submit informed revised offers." *Id.* Second, in *Caddell* the awardee's proposed "price . . . ha[d] been publicly disclosed," which "would give [the plaintiff] and other offerors an unfair advantage over the awardee in a price reevaluation." *Id.* Similarly, in this procurement, plaintiff learned of QTC's proposed price and suspected it only lost the award based on the price difference. *See* Pl's MJAR at 29 ("Given the same opportunities . . . [plaintiff] likely would have lowered its price significantly . . . thereby giving it substantial chance of award."). Meanwhile, QTC was not given an opportunity in corrective action to adjust proposed price—QTC was only allowed to correct a weakness the government should have noticed before award. AR at 1238 ("[T]he Government reserves the right to award without conducting discussions should it be determined to be in the [g]overnment's best interest. Therefore, the initial proposed prices shall represent best and final prices."). The court in *Caddell* found "to achieve a level playing field," the government "must cure its misleading discussion," but "a broad reopening of discussions is unnecessary to cure the procurement error and would cause more harm than good" because the "misleading discussion" impacted only the offeror the government reopened discussion for. 125 Fed. Cl. at 55. The court found, because "the other offerors had a fair shot at revising their final pricing proposals, [] it would be unfair to give them another bite at the apple, especially given that all the other offerors now know" the awardee's final price.[5] *Id.*

Plaintiff cites *Centerra* for the following rule: "if an agency holds or reopens discussions with one offeror, it must do so with all offerors whose proposals are in the competitive range." *Id.* at 26 (citing *Centerra*, 138 Fed. Cl. at 416). In *Centerra*, following remand from this court, the awardee made a variety of improvements to its offer. *Centerra*, 138 Fed. Cl. at 416–18. For example, the awardee "was afforded an opportunity to explain how its proposal would meet proposal requirements, despite a proposal line item that was non-compliant with the RFQ requirement," and the awardee's "lengthy responses to DOJ's questions on remand show that [the awardee] materially revised its Transition Plan to address multiple flaws that [plaintiff] pointed out in this bid protest." *Id.* at 417–18. Additionally, "during the remand [the awardee] was directed to '*not* provide . . . [a] revised price proposal.' . . . [but the awardee] *did* change its price proposal." *Id.* at 420 (emphasis in original). These facts are not applicable to this case—plaintiff fails to demonstrate the court's fact-dependent determination in *Centerra* establishes a rule for how this Court should treat corrective action resulting from government error in the

---

[5] In *Peraton*, the GAO similarly concluded the government must "raise a deficiency that was present in an offeror's initial and revised proposals," and the government as a result "may focus corrective action to address procurement errors identified by our Office through the ADR process." *Peraton Inc.*, B-416916.5 (Apr. 13, 2020), 2020 CPD ¶ 144 at 7. In *Environmental Chem. Corp.*, the GAO similarly allowed an agency to hold corrective action discussions with only one offeror where the discussions and proposal revisions were limited solely to addressing a fault in the offeror's proposal the government should have raised in discussions. *Environmental Chem. Corp.*, B-416166.3, et al. (June 12, 2019), 2019 CPD ¶217 at 20–21. Plaintiff implicitly argues the actions this court approved in *Caddell* and the GAO approved in *Peraton* and *Environmental Chem. Corp.*—namely "conducting discussions only with the putative awardee in response to a bid protest"—make "'a mockery of fundamental fairness and competitive principles.'" Pl.'s MJAR at 27 (quoting *Centerra*, 138 Fed. Cl. at 416).

evaluation process, particularly as similar corrective action was approved in *Caddell*, *Peraton*, and *Environmental Chem.*, all discussed immediately *supra*. *See, e.g.*, *Caddell*, 125 Fed. Cl. at 55 ("[I]n the instant case, such a broad reopening of discussions is unnecessary to cure the procurement error and would cause more harm than good."). While in *Caddell* the court focused on allowing only further action necessary to cure a procurement error, the court in *Centerra* acknowledged, but dismissed, the harm to fairness considerations related to allowing broad reopening of discussions when plaintiff knew the awardee's price, noting "the disclosure of Paragon's price is unfortunate and may affect the competition for this task order." *Centerra*, 138 Fed. Cl. at 422. Counsel for the government explained at oral argument *Centerra* was not a case where "the agency was correcting the failure to provide meaningful discussions in the first instance to an offeror," as is the case in this procurement. Tr. at 115:1–5; *Centerra*, 138 Fed. Cl. at 416–18.

Plaintiff also cites this court's decision in *Dynacs* to support its argument, "if an agency holds or reopens discussions with one offeror, it must do so with all offerors whose proposals are in the competitive range." Pl's MJAR at 26 (citing *Dynacs Eng'g Co.*, 48 Fed. Cl. at 130). In *Dynacs*, this court found error "in NASA's discussions with [the awardee] regarding weaknesses in its proposal, which were identified prior to and remained after the submission of [the awardee's] FPR# 1 proposal, without discussing the weaknesses in [plaintiff's] proposal identified prior to and remaining after its FPR# 1 submission." *Dynacs*, 48 Fed. Cl. at 136. Both aspects of the court's finding in *Dynacs* are distinguishable from the circumstances in this case. First, in *Dynacs* the government previously discussed with the awardee weaknesses over which it later reopened discussions, while the government in this case pursued corrective action only because it had not previously identified the deficiency GAO highlighted during outcome prediction ADR. *Id.*; AR at 241–42, 475. The government convincingly argues in this case it would have been unfair not to allow QTC to address the deficiency, because the government was at fault for not previously identifying it; meanwhile, the government in *Dynacs* offered no fairness justification for reopening discussions with the awardee over weaknesses "which were identified prior to and remained after the submission of [awardee's] FPR# 1 proposal." *Dynacs*, 48 Fed. Cl. at 136; Gov't Cross-MJAR at 43 ("Allowing LHI to make unfettered proposal revisions during the corrective action, despite having no remaining weaknesses or deficiencies, would effectively punish *QTC* for *DoD's mistake* in failing identify the QTC program manager deficiency during the initial pre-award discussions.") (emphasis in original). *Dynacs* actually supports the fairness of the government's corrective action in this case; as the court explained, "[t]he law is well-settled that discussions between a contracting officer and offerors must be meaningful," but "[a]n agency's failure to advise an offeror, in some way, of material proposal deficiencies vitiates the meaningfulness of the discussions." *Dynacs*, 48 Fed. Cl. at 131. Second, if the government in *Dynacs* did want to discuss the awardee's weaknesses remaining after the first FPR, the court noted the government should have also discussed plaintiff's remaining weaknesses following the first FPR. *Dynacs*, 48 Fed. Cl. at 136 (finding error "in [the agency's] discussions with [the awardee] regarding weaknesses in its proposal . . . without discussing the weaknesses in [plaintiff's] proposal identified prior to and remaining after its . . . submission"). Plaintiff in this case had no remaining deficiencies; rather, it merely hoped to have another opportunity to improve its offer. Tr. at 98:17–22. As the court in *Dynacs* explained, however, "[t]he government need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is

technically acceptable but presents a less desirable approach than others." *Dynacs*, 48 Fed. Cl. at 131 (quoting *Cube Corp.,* 46 Fed. Cl. 368, 384 (2000)) (internal quotations omitted).

At oral argument, counsel for plaintiff asserted it was prejudiced by the government's decision because "is entirely possible" plaintiff would have lowered its price on its sixth proposal, having only been given the opportunity to submit four proposals. Tr. at 131:12–18; *see also* Pl.'s MJAR at 29. Plaintiff had the opportunity to lower its price proposal when submitting its FPR in November 2019, but it declined to do so. AR at 2479 (noting in the final price evaluation report plaintiff's final pricing was the same as its July 2019 price submission); *see also* Tr. at 131:22–24 (government counsel noting plaintiff "had the opportunity to lower their price in November 2019[;] . . . if they wanted to lower their price, they could have done it [then]"). Plaintiff actually increased its price proposal over the course of discussions, from $[XX XXXXXXXXXXXX] to $899,979,399.09. *See id.* at 1550 (LHI 29 June 2018 Proposal); *id.* at 2300 (LHI 3 July 2019 Proposal). Counsel for QTC also noted QTC made "a drastic reduction" in its final price submission, and "[t]he difference between the offers went from $[XX] million to more than $50 million." Tr. at 102:6–13. Regarding plaintiff's assertion it would have improved its price if given additional opportunities, the solicitation warned offerors: "the Government reserves the right to award without conducting discussions should it be determined to be in the Government's best interest. Therefore, the initial proposed prices shall represent best and final prices." AR at 1238 (Solicitation Attachment 6). Plaintiff offers no convincing argument for why fairness requires the Court to grant plaintiff the opportunity to now adjust its price, rather than merely to offer a new program manager, which is all the GAO's corrective action allowed QTC to do. *See* Tr. at 101:9–15.

Plaintiff grounds its opposition to the government's corrective action on fundamental fairness concerns and its understanding of what constitutes a final proposal revision, but case law demonstrates this court and the GAO have interpreted the FAR to support narrow corrective action to address government error like the corrective action in this contract. *See Caddell*, 125 Fed. Cl. at 34, 55; *Peraton Inc.*, B-416916.5 2020 CPD ¶ 144; *Environmental Chem. Corp.*, B-416166.3, et al., 2019 CPD ¶ 217 at 20–21; *Dynacs*, 48 Fed. Cl. at 131, 136. The logical implication of plaintiff's fairness argument is the government's mistake in not identifying QTC's need to improve its proposed program manager should have resulted in further unfairness to QTC by allowing plaintiff to improve its price proposal after knowing it lost a close competition, likely based on price. *See Caddell*, 125 Fed. Cl. at 55 ("[T]o achieve a level playing field, . . . [the government] must cure its misleading discussion," but "a broad reopening of discussions is unnecessary to cure the procurement error and would cause more harm than good" because the "misleading discussion" impacted only the offeror; thus, because "the other offerors had a fair shot at revising their final pricing proposals, [] it would be unfair to give them another bite at the apple, especially given that all the other offerors now know . . . [the awardee's] final award price."). The law requires the Court give broad leeway to an agency's decision regarding corrective action. The Federal Circuit has "consistently reviewed agencies' corrective actions under the APA's 'highly deferential' 'rational basis' standard." *Dell Fed. Sys.*, 906 F.3d at 992. "The arbitrary and capricious standard applicable here is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058.

Plaintiff requests the government override its required "common cut-off date only for receipt of final proposal revisions," even though the government is only required to "indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR 15.307(b); FAR 15.306(d)(3). While the parties' final proposals in November 2019 must be their *final* proposals, the government's minor corrective action to fix QTC's program manager had nothing to do with the price QTC proposed, and plaintiff does not now seek to improve a similar program manager offering. As counsel for the government explained at oral argument, if the agency had recognized the error addressed in corrective action prior to the filing of the final offers, "[i]t would have given QTC the opportunity to address that then and QTC probably would have substituted its program manager and [plaintiff] would have done nothing differently, because it wouldn't have even known about that." Tr. at 124:4–16. The Court finds plaintiff failed to show any clear or prejudicial violation of the FAR from the government's minor corrective action to address its own error. *Domenico Garufi*, 238 F.3d at 1332–33 (When alleging "the procurement procedure involved a violation of regulation or procedure," plaintiff "must show 'a clear and prejudicial violation of applicable statutes or regulations.'"). The government's limited corrective action was reasonable and tailored to the proposals and circumstances. FAR 15.306(d)(3); 15.306(d)(1) ("The scope and extent of discussions are a matter of contracting officer judgment," and discussions must be "tailored to each offeror's proposal."); *see also Labatt Food Service, Inc. v. United States*, 577 F.3d 1375 (Fed. Cir. 2009) ("All errors are not equal. There are inherent competitive advantages to submitting a proposal after all other parties are required to do so, such as access to post-deadline news and market information that could result in last minute changes to the proposal.").

## VI.   Whether the Army Failed to Evaluate QTC's Prices for Balance

### A.   Whether the Army Failed to Recognize QTC as Proposing Significantly Overstated and Understated Unit Prices

Plaintiff argues the Army failed the requirement under the solicitation "to evaluate whether each offeror's prices were balanced under FAR 15.404-1(g)," which "requires an agency 'to determine, among other potential pitfalls, whether the *unit prices* are unbalanced.'" Pl.'s MJAR at 29–30 (citing *Al Ghanim Combined Grp. Co. Gen. Trade v. United States*, 56 Fed. Cl. 502, 513 (2003); AR at 1245) (emphasis in original).[6] According to plaintiff, "the Army failed to conduct any evaluation of whether QTC's unit prices were unbalanced," instead only "compar[ing] QTC's top-level CLIN prices" but not "whether QTC's individual unit-level prices for the different procedures were unbalanced," even though "the CLIN prices are the product of hundreds of unit prices for individual procedures." *Id.* at 30. Plaintiff argues "an agency's failure to 'perform[] the first step of the mandatory analysis, *i.e.* whether there was unbalanced pricing, . . . is sufficient on its own to justify remand.'" *Id.* (quoting *IAP World Servs., Inc. v. United States*, No. 20-1116 C, 2021 WL 451002 at *15 n.6 (Fed. Cl. Jan. 21, 2021)). Plaintiff

---

[6] Plaintiff notes the FAR requires: "All offers with separately priced line items or subline items shall be analyzed to determine if the prices are unbalanced." *Id.* at 30 (quoting FAR 15-404.1(g)(2)). Plaintiff also quotes FAR 15:404-1(g)(1)(iii): "The greatest risks associated with unbalanced pricing occur when . . . [t]he evaluated price is the aggregate of estimated quantities to be ordered under separate line items of an indefinite-delivery contract." *Id.*

asserts "QTC's proposal contains numerous unit prices that are significantly overstated and understated, which is the very definition of unbalanced pricing." *Id.* at 31; *see id.* at 31–34 (plaintiff discussing areas where it alleges QTC's prices are unbalanced).

The government argues plaintiff "has not demonstrated any error in DoD's evaluation of QTC's proposal for unbalanced pricing." Gov't Cross-MJAR at 28. According to the government, it had "no obligation to analyze individual procedure prices for balance, because these individual procedures were not 'line items or subline items' of the solicitation.'" *Id.* (citing FAR15.404-1(g)(2)). The government asserts, "the FAR requires that only 'line items and subline items' must be analyzed for balance, not other components of line item prices," and it correspondingly argues, "[t]he individual procedures in the solicitation's pricing matrix were plainly not designated as 'subline items,' as they do not contain all the elements required by the FAR." *Id.* at 29–30 (citing AR at 1201–16); *see also id.* at 30 ("[T]he solicitation's schedule listed 28 line items and zero subline items.") (citing AR at 8274–87). The government notes plaintiff's reliance on this court's decision *Al Ghanim* is misplaced because in *Al Ghanim*, "the Court determined that the agency failed to adequately evaluate the *line item* prices for balance," while "[n]othing in *Al Ghanim* suggests that agencies are required to evaluate individual components of line item prices for balance." *Id.* at 31 (citing 56 Fed. Cl. at 513–14) (emphasis in original).

QTC argues "there can be no genuine dispute that the Agency's price evaluation included an examination for unbalanced pricing," and plaintiff wrongly "contends that the agency was required to analyze each and every procedure price for balance." Def.-Intervenor's Cross-MJAR at 37 (citing *Biospherics, Inc. v. United States*, 48 Fed. Cl. 1, 10 (2000) ("The depth of an agency's price analysis is a matter within the sound exercise of the agency's discretion and we will not disturb such an analysis unless it lacks a reasonable basis.")). QTC further argues plaintiff's arguments are untimely under *Blue & Gold*, an argument the Court addresses *infra*.

The FAR requires: "All offers with separately priced line items or subline items shall be analyzed to determine if the prices are unbalanced." FAR 15.404-1(g)(2). Additionally, the contracting officer is required to: (1) "[c]onsider the risks to the Government associated with the unbalanced pricing in determining the competitive range and in making the source selection decision"; and (2) "[c]onsider whether award of the contract will result in paying unreasonably high prices for contract performance." FAR 15.404-1(g)(2)(i)–(ii). The FAR does not provide a standard for an unacceptably unbalanced level of pricing, but it notes "[a]n offer may be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government." FAR 15.404-1(g)(3). The FAR defines "line item" as "the basic structural element in a procurement instrument that describes and organizes the required product or service for pricing, delivery, inspection, acceptance, invoicing, and payment. The use of the term 'line item' includes 'subline item,' as applicable." FAR 2.101. "Subline item" is defined as "a subset of a line item." *Id.*

The solicitation states, "[t]he Price/Cost Factor will be evaluated, but will not receive an adjectival rating." AR at 1244 (Solicitation Attachment 6). Specifically regarding unbalanced pricing, the solicitation provides the following: "The Offeror's proposal will be evaluated for unbalanced pricing utilizing cost or price analysis techniques. The Government may determine

that a proposal is unacceptable if the prices proposed are materially unbalanced.  In accordance with FAR 15.404-1(g), a proposal may be rejected if the Contracting Officer determines that the lack of balance poses an unacceptable risk to the Government."  *Id.* at 1245.

"Procurement officials have substantial discretion to determine which proposal represents the best value for the government."  *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)).  "[I]n a 'best value' procurement . . . the agency considers other factors in addition to price in making award . . . ."  *J & D Maint. & Servs. v. United States*, 45 Fed. Cl. 532, 536 (1999).  "A mathematical imbalance [may not be enough] to cause the bid to be rejected" because "the FAR and RFP only prohibit *materially* unbalanced bids."  *Id.* at 536–37 (citing FAR 15.404-1(g)) (emphasis in original).  A bid is only materially unbalanced if the government finds "it posed an unacceptable risk."  *Id.*; *see also* 15.404-1(g)(3).  "The structure of [awardee's] bid would only pose an unacceptable risk if its true price made it far from the best value."  *J & D Maint. & Servs.*, 45 Fed. Cl. at 537 (citing *Anderson Columbia Environmental v. United States*, 43 Fed. Cl. 693, 699 (1999)).  As Judge Smith of this court recently found, "[t]his Court has previously held that '[t]he depth of an agency's price analysis is a matter within the sound exercise of the agency's discretion and [the Court] will not disturb such an analysis unless it lacks a reasonable basis.'"  *Worldwide Language Res., LLC. v. United States*, 127 Fed. Cl. 125, 134 (2016) (quoting *Biospherics, Inc. v. United States*, 48 Fed. Cl. 1, 10 (2000) (citation omitted)).  "[T]he FAR states that an offer may, not must, be rejected if the agency determines that the unbalancing poses an unacceptable risk.  The FAR gives the agency discretion to make that determination."  *CCL Serv. Corp. v. United States*, 48 Fed. Cl. 113, 122 (2000) (citing FAR 15.404–1(g)(3)) (internal citation omitted).

Counsel for plaintiff clarified at oral argument plaintiff specifically alleges the government violated "[t]he requirement to analyze subline items for balance," assuming "the line item is the CLIN, and the agency evaluated the CLIN for balance, but the procedures are the subline items and the agency never evaluated those for balance."  Tr. at 144:5–9.  Counsel for the government agreed "the FAR requires . . . a balanced pricing analysis for subline items."  *Id.* at 157:15–16.  The government disputes, however, whether individual procedure prices are subline items simply because they are below the line items:  "for the individual procedure prices, [the government's] position is that they're not subline items and did not need to be evaluated for balance."  *Id.* at 158:4–6.  Counsel for the government explains the government "used the proper numbering system to designate" line items and "called them CLINs, contract line item numbers," but the government "did not designate anything in the solicitation as a subline item.  They didn't designate anything in the solicitation as an exhibit line item."  *Id.* at 158:16–24.  According to the government, the mere existence of individual procedure prices does not make those prices subline items:  "the individual procedures were not designated as subline items or exhibit line items for that matter and they . . . didn't have the numbering system that's specifically required by the DoD procedure."  *Id.* at 146:16–22.

Counsel for plaintiff responded, "[t]here was certainly nothing in the solicitation that said these are not line items. . . .  [T]here were the CLINs, the CLINs directed you to the attachment, and the attachment had the component level pricing."  *Id.* at 182:9–13.  Counsel for plaintiff asserted "it was entirely reasonable to understand those to be subline items," despite

acknowledging "the fact that the agency called it an attachment versus an exhibit" and did not use the proper designation. *Id.* at 182:9–20. Counsel for plaintiff also noted, "on the face of the solicitation, the CLINs tie to the attachment and the attachment lists procedures, and those [] fit the FAR definition of subline items, and they appear to be subline items." *Id.* at 183:8–12. Counsel for the government emphasized the importance of the distinction between attachments and exhibits in this context, noting, to be designated a subline item, an item "would have had to have been included within an exhibit," as distinct from the situation here where "it was designated as an attachment." *Id.* at 187:13–15. This distinction, the government explained, is significant because "DFAR[S] 204.7101 specifically defines attachments and exhibits differently." *Id.* at 187:15–17. Under Defense Federal Acquisition Regulation Supplement ("DFARS") 204.7101:

> "Attachment" means any documentation, appended to a contract or incorporated by reference, which does not establish a requirement for deliverables. . . . "Exhibit" means a document, referred to in a contract, which is attached and establishes requirements for deliverables. The term shall not be used to refer to any other kind of attachment to a contract. The DD Form 1423, Contract Data Requirements List, is always an exhibit, rather than an attachment.

These definitions emphasize the legal significance of the DFARS' distinction between attachments and exhibits, since attachments "do[] not establish a requirement for deliverables," but exhibits do "establish[] requirements for deliverables." DFARS 204.7101. Additionally, while there are specific procedures for numbering subline items, the government's Procedures, Guidance, and Information ("PGI") only mentions exhibits, not attachments, as acceptable vehicles for subline items: "[e]xhibits may be used as an alternative to setting forth in the schedule a long list of contract subline items." PGI 204.7104-2(c). The PGI also notes, "[t]he contracting officer may append attachments to exhibits," further demonstrating the government's point that exhibits and attachments are not interchangeable terms. PGI 204.7105(a)(7).

Counsel for the government also observed at oral argument the government "reviewed QTC's proposal for unbalanced pricing and actually identified a concern in QTC's initial proposal." Tr. at 144:18–20. Counsel for QTC also explained at oral argument the government did evaluate QTC's pricing for balance at the line level: "CLIN pricing was evaluated using the base year and internally within the option periods. . . . [T]he balance was evaluated between base year and the option year and between the option years they were balanced." *Id.* at 150:7–12 (citing AR at 2938–39 (QTC Final Price/Cost Evaluation Attachment, dated November 26, 2019)). The government explained in its price analysis report of QTC's final proposal revision, "[t]he Government may determine that a proposal is unacceptable if the prices proposed are materially unbalanced. Unbalanced pricing exists when . . . one or more contract line items are significantly overstated or understated . . . . In accordance with FAR 15.404-1(g), a proposal may be rejected if the Contracting Officer determines that the lack of balance poses an unacceptable risk to the Government." AR at 2938–39. The government notes it had concern after conducting an "[i]nitial review of QTC's proposed amounts for the majority of the procedures," but "QTC provided additional rationale for the proposed amounts that appeared unbalanced" and a "revised QTC Volume III – Price/Cost." *Id.* at 12036, 12038.

Plaintiff cites *IAP WorldServices*, a decision from this court, for the following per se rule: "an agency's failure to 'perform[] the first step of the mandatory analysis, *i.e.*, whether there was unbalanced pricing, . . . is sufficient on its own to justify remand.'" Pl.'s MJAR at 30–31 (quoting *IAP WorldServices*, 2021 WL 451002 at *15 n. 6). Plaintiff does acknowledge the government "compare[d] QTC's top-level CLIN prices in the Base Period versus the Option Periods," but insists "the CLIN prices are the product of hundreds of unit prices for individual procedures" and "the agency never evaluated whether QTC's individual unit-level prices for the different procedures were unbalanced." *Id.* at 30. QTC clarifies the dispute is whether the government "examine[d] balance at a low-enough level," since the government "conducted this [CLIN] comparison across the base and options years, while also comparing the prices to the independent government cost estimate." Def.-Intervenor's Cross-MJAR at 36–37. QTC also effectively distinguishes *IAP WorldServices*, as the government in that case "had not examined any prices for balance at all." *Id.* at 37. Plaintiff in this case cannot dispute the government performed some of the required first step of mandatory analysis for balanced prices; rather, plaintiff only disputes whether that analysis improperly failed to include subline items. While plaintiff cites *Al Ghanim* for the proposition the government must determine whether unit prices are unbalanced, the court in *Al Ghanim* found the appropriate method of determining balance in the unit prices was to evaluate the CLIN items: "the Corps violated an applicable procurement regulation by failing to compare the CLIN prices submitted by the offerors with the unit prices in the government estimate." *Al Ghanim Combined Grp. Co. Gen. Trad. & Cont.*, 56 Fed. Cl. at 520. The court found that while "the applicable regulations require that an agency reviewing a proposal containing CLINs perform a cost analysis to determine, among other potential pitfalls, whether the unit prices are unbalanced," the government erred by "perform[ing] no cost analysis whatsoever." *Id.* at 513. As counsel for plaintiff in this case agreed at oral argument, "the agency evaluated the CLIN for balance." Tr. at 144:7.

In *Worldwide Language*, this court agreed with what "[t]his Court has previously held" in *Biospherics*, "that '[t]he depth of an agency's price analysis is a matter within the sound exercise of the agency's discretion and [the Court] will not disturb such an analysis unless it lacks a reasonable basis." *Worldwide Language Res., LLC. v. United States*, 127 Fed. Cl. at 134 (quoting *Biospherics, Inc. v. United States*, 48 Fed. Cl. at 10 (2000) (citation omitted)). The government's final price/cost evaluation of QTC notes: "Unbalanced pricing exists when . . . one or more contract line items are significantly overstated or understated . . . ." *Id.* at 2938–39. The evaluation explains it operates according to "[t]he following proposal submission requirements [] detailed in Attachment 0005 (Proposal Submission Instructions) of the solicitation," which discuss contract line items but do not contemplate subline items. *Id.* at 2934–35; *see id.* at 1106 (Solicitation Attachment 5). "Procurement officials have substantial discretion to determine which proposal represents the best value for the government," and the Court finds the government in this case exercised its discretion reasonably in analyzing unbalanced pricing under FAR 15.404-1(g), reviewing QTC's proposal for balance, identifying issues, and asking QTC for more information. *CHE Consulting*, 552 F.3d at 1354; *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (holding this Court may set aside a contract award if "the disappointed bidder [has shown] a clear and prejudicial violation of applicable statutes or regulations") (internal quotations omitted); AR at 2938–39 (the government's final price/cost evaluation of QTC). The Court does not find the government's determination unreasonable that it had "no obligation to analyze

-36-

individual procedure prices for balance, because these individual procedures were not 'line items or subline items' of the solicitation,'" and the government's determination did not "entirely fail[] to consider an important aspect of the problem, offer[] an explanation for its decision that runs counter to the evidence before the agency, . . . [and was not] so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Gov't Cross-MJAR at 28; *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009).

### B.  Whether the Army's Alleged Failure to Recognize Unbalanced Pricing Resulted in a Failure to Recognize Associated Potential Risks

Plaintiff argues "QTC's unbalanced pricing shows that QTC failed to understand the RFP requirements and thus poses a serious risk to successful performance of the contract."  Pl.'s MJAR at 35.  According to plaintiff, "QTC's pricing approach betrays a complete lack of understanding when it comes to central areas of RHRP-3 . . . ."  *Id.*  Relatedly, plaintiff asserts, "QTC's unbalanced pricing also created a significant risk that the Army would end up paying unreasonably high prices for contract performance" if "the government needs more than the estimated quantity for one of the procedures that QTC overpriced."  *Id.* at 36–37.

The government responds by noting plaintiff "has not demonstrated how it was prejudiced by DoD's [alleged] failure to conduct this evaluation," since plaintiff "also proposed [XXXXXX] of individual procedure prices that were [XX] percent higher or lower than the Government estimate and QTC's prices," meaning "[b]y its own metrics, LHI's individual procedure prices were also unbalanced."  Gov't Cross-MJAR at 32–33 (citing AR at 5032, 5034–41; GAO Op. 18–19 n.15).

QTC argues plaintiff "does not point to any legal standard" for determining "the benchmark for unbalanced pricing" and "fails to explain why the Court must accept [plaintiff's] [XXX] test as the benchmark."  Def.-Intervenor's Cross-MJAR at 35.  QTC additionally notes, according to plaintiff's standard, its "own pricing is similarly unbalanced," meaning plaintiff "should not be heard to advance a position in litigation that is inconsistent with its own proposal approach."  *Id*. at 36 (citing *Eskridge & Assocs. v. United States*, 142 Fed. Cl. 410, 423 (2019)).[7]

Where an offeror's pricing is unbalanced, "the contracting officer shall (i) Consider the risks to the Government associated with the unbalanced pricing in determining the competitive range and in making the source selection decision; and (ii) Consider whether award of the contract will result in paying unreasonably high prices for contract performance."  FAR 15.404-1(g)(2).  "An offer may be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government."  FAR 15.404-1(g)(3).  To succeed on its claim, plaintiff must "demonstrate[] and the record [must] reflect that award of the contract to

---

[7] QTC offers "an illustration of [plaintiff's] double standard":  plaintiff "asserts that [XXX] of QTC's prices [XXX] 'more than [XXXX] higher' than the IGCE.  But [XXX] of [plaintiff's] prices [XXXXXXXXXXXXXXXXXXXXXXX XX] more than [XXXXX] above the IGCE, and [XXX] other prices [XXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXX] nearly [XXXX] higher than the IGCE.  [Plaintiff] deems a price [XXX] above the IGCE as [XXXXXX XXXXXXXXXXXXXXXXX] but [plaintiff's] proposed prices were more than [XXX] above the IGCE for [XXXX XXXXXXXX] procedures, or [XXXXXXXXXXX] of the procedures."  Def.-Intervenor's Cross-MJAR at 36 n.15 (citing AR at 5034, 5034–37) (internal citations omitted).

[awardee] 'will result in paying unreasonably high prices for contract performance.'" *Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173, 225 (2006) (citing FAR 15.404-1(g)(2)(ii)).

"[T]o prevail [plaintiff] must establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996). The Federal Circuit rejected the protest of an unsuccessful offeror who could not show "how the government's error caused [plaintiff] to suffer disparate treatment or particularized harm." *Labatt Food Service, Inc. v. United States*, 577 F.3d 1375, 1380 (Fed. Cir. 2009). To establish prejudice, a plaintiff must "show that there was a substantial chance it would have received the contract award but for" the alleged error. *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013). Plaintiff must offer more than "conjecture that even with a [change in rating] it would have had a substantial chance of prevailing in the bid." *Id.* "A party can have a substantial chance at award and still not be prejudiced where, *e.g.*, the error is minor or affects all parties equally." *Eskridge & Assocs.*, 142 Fed. Cl. at 422, *aff'd*, 955 F.3d 1339 (Fed. Cir. 2020) (citing *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018); *Labatt*, 577 F.3d at 1380–81).

The Court found immediately *supra* the government reasonably evaluated QTC's proposed prices for balance. In the alternative, the Court will consider whether, assuming QTC's proposed prices were unbalanced: (1) "QTC's [allegedly] unbalanced pricing shows that QTC failed to understand the RFP requirements and thus poses a serious risk to successful performance of the contract"; or (2) "QTC's unbalanced pricing also created a significant risk that the Army would end up paying unreasonably high prices for contract performance." Pl.'s MJAR at 35–36. The government asserted at oral argument that even if QTC's prices were unbalanced, plaintiff still "has to demonstrate prejudice. The fact that it has the same alleged issue as QTC demonstrated that the offerors weren't treated unequally here and [plaintiff] hasn't suffered any particularized harm from the agency's failure to conduct the balanced pricing evaluation at the level of detail [plaintiff] claims is required." Tr. at 148:12–18.[8]

---

[8] The GAO advisory opinion analyzed plaintiff's proposed procedure-level prices and "noted that the protestor's own proposal suffered from the same perceived defects." GAO Advisory Op. at 18 n.15. The GAO says it "would have agreed with the intervenor that, to the extent QTC's procedure-level pricing may have presented a risk of overpayment or underperformance, the protestor failed to explain why those same risks also would not have applied to its own proposal." *Id.* The GAO thus "would not have found this argument to provide a basis to sustain the protest." *Id.* (citing *Raytheon Co.*, B-417524.2, B-417524.3, Dec. 19, 2019, 2020 CPD ¶ 50 at 8 (noting the integrity of the procurement process did not allow the protester to espouse a position in litigation different than the position taken by the protester in how it structured its own proposal submission)). Specifically, the GAO credited QTC's analysis: "The intervenor pointed out, however, that [plaintiff's] proposed prices were more than [XXXXXXXXX X] higher than QTC's prices or the IGCE [XXXXX] as often as QTC's during the first option period, for example, and that [plaintiff] proposed more than [XXXXXXXXXX] procedure-level prices that were more than [XXXXXXX XXX] lower than QTC's prices or the IGCE. The intervenor also pointed out that while [plaintiff] maintained in its protest that multiple procedure-level prices proposed by QTC were [XXXXXXXXXXXXXXXXXXXXXXXX] because they were more than [XXXXXXXXXX] above the IGCE, the protester's own proposed prices were more than [XX] percent above the IGCE for [XX] different procedures, and, thus, were [XXXXXXXXXXXXXXXXXXX XXXXX] by the protester's own logic." *Id.* (internal citations omitted).

Regarding price balance, this court has previously ruled that a "plaintiff's own bid is mathematically unbalanced [where] [a]t least 30% (more than [awardee's] 22%) of plaintiff's CLINs on the bidding schedule varied from the government's estimate by more than 50%. It is therefore reasonable to assume that [awardee's] bid would not be materially unbalanced even with more accurate estimates." *Anderson Columbia Env't*, 43 Fed. Cl. at 701. The court in *Anderson Columbia* found "plaintiff offer[ed] no evidence to show that the rest of the government's estimated quantities are inaccurate," and, as a result, "plaintiff has not satisfied its burden of proving that [awardee's] bid was materially unbalanced." *Id.* Similarly here, plaintiff states it is "nearly certain" the government's needs for services related to some aspects of the contract "will be higher" than estimates, but plaintiff provides no evidence for this position. Pl.'s MJAR at 37. As QTC explained, "for an IDIQ contract such as the one at issue here, a 'key consideration is the accuracy of the government's quantity estimates' and that 'if the estimates are reasonably accurate, then evidence of mathematical unbalancing generally does not present a risk that the government will pay unreasonably high prices for contract performance.'" Def.-Intervenor's Cross-MJAR at 38 (quoting *Accumark, Inc.*, B-310814, Feb. 13, 2008, 2008 CPD ¶ 68 at 4).

Counsel for plaintiff asserted at oral argument, "if the agency were to conclude that both offerors were unbalanced, then it cannot make award to either offeror. And at that point, it's got to open discussions and fix the problem." Tr. at 165:6–9. Counsel for the government observed, however, "[t]hat's not what the solicitation or the FAR says at all." *Id.* at 165:23–24. Instead, "in accordance with FAR 15.404-1(g), . . . the Government has discretion to make that determination of whether there is an imbalance or whether there is a material imbalance," meaning "[w]hether it's something that poses an unacceptable risk to the Government or not." *Id.* at 166:3–10; *see* FAR 15.404-1(g)(3) ("An offer may be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government.").

The government acted in accordance with its discretion under FAR 15.404-1(g) to determine whether any mathematical unbalance created material unbalance not worth the risk. *See supra*; *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."). "It is therefore reasonable to assume that [awardee's] bid would not be materially unbalanced" to an unacceptable extent when "plaintiff's own bid is mathematically unbalanced" to an arguably greater extent. *Anderson Columbia Env't*, 43 Fed. Cl. at 701. Plaintiff "offer[ed] no evidence to show that the rest of the government's estimated quantities are inaccurate," and as a result, "plaintiff has not satisfied its burden of proving that [awardee's] bid was materially unbalanced." *Id.*

## VII.    Whether the Army's Best Value Determination Was Rational

Regarding best value determination, plaintiff argues: "All of the aforementioned errors invalidate the Army's best value determination," because "the Army improperly distorted the real differences between [plaintiff] and QTC's proposals." Pl.'s MJAR at 37–38. Plaintiff also argues there is "another, independent flaw" in the Army's best value analysis: "a large portion of QTC's supposed price advantage is [allegedly] illusory" because "[o]ver $[XX] million (*i.e.*,

about [XX]%) of that price difference is attributable to QTC's procedure prices in the base year of the contract," but "it is likely that QTC will perform no procedures in the base year."  *Id.* at 38 (emphasis omitted).

The government explains the source selection authority "considered the offerors' total evaluated prices in his tradeoff analysis, without subtracting the prices of any base year procedures, . . . [i]n accordance with the terms of the solicitation and 10 U.S.C. § 2305(b)(1)." Gov't Cross-MJAR at 35 (citing AR at 13257–59).  QTC agrees that "[e]valuations and award decisions must be based on the RFP's terms."  Def.-Intervenor's Cross-MJAR at 39 (citing 41 U.S.C. § 3701(a)).  QTC explains plaintiff's argument "that the Agency should have assessed best value by disregarding the 12-month base period that the RFP required the offerors to price" must fail because it requires the government to "instruct the offerors to price a 12-month period and then disregard it when making its award decision."  *Id.* at 38–39.

Counsel for plaintiff focused on its second argument at oral argument, emphasizing, "it is a fact that the Government is never going to see the supposed savings for those [XXXXX] months, because while QTC is in transition, it is not providing procedures."  Tr. at 168:7–10. Instead, "[t]he procedures will continue to be ordered under the old contract and the Government is not going to see that [XXXXX] months of savings," so the savings is "only about [XXXXXXX]" of the "$[XX] million difference in the base year" the source selection authority identified.  *Id.* at 168:10–16.  Counsel for plaintiff argued the source selection authority should have looked beyond the numbers in the proposals "to properly understand . . . the true relative cost of the two proposals, and here that didn't happen," meaning the source selection authority allegedly overestimated the gap in the actual amount the offerors will charge the government. *Id*. at 169:1–9.

Counsel for the government noted at oral argument, "the source selection authority followed the solicitation terms in using the total evaluated prices of the offerors in . . . his tradeoff analysis in order to determine the best value in this case" because "[t]hat's exactly what the solicitation required him to do."  *Id*. at 169:22–170:2.  Counsel for QTC explained, "the RFP had to come up with a way to evaluate prices on a fair basis" during the transition period, and "the RFP was very clear, it states a total evaluated price will be calculated for each offeror and used in the tradeoff analysis to determine best value."  *Id.* at 171:3–12 (citing AR at 1244 (Solicitation Attachment 6)).  As counsel for QTC observed, "[i]f the SSA had conducted this tradeoff by reasons set forth in the base period would not occur [sic], he wouldn't be using the total evaluated prices defined in the RFP," meaning what plaintiff is arguing "is that the [source selection authority] should have ignored the RFP."  *Id*. at 172:13–18.

The government also argues plaintiff's "challenge to the best-value tradeoff is really an untimely challenge to the terms of the solicitation that is waived under *Blue & Gold*."  Gov't Cross-MJAR at 34.  This is because "the terms of the solicitation and 10 U.S.C. § 2305(b)(1)" required the government to "consider[] the offerors' total evaluated prices . . . without subtracting the prices of any base year procedures."  *Id.* at 35 (citing AR at 13257–59).  QTC agrees with the government that plaintiff's argument "is time barred," since the Army "could not reasonably instruct the offerors to price a 12-month period and then disregard it when making its

award decision" and "[e]valuations and award decisions must be based on the RFP's terms." Def.-Intervenor's Cross-MJAR at 38–39 (citing 41 U.S.C. § 3701(a)).

> The solicitation provides:
>
> The total evaluated price will be calculated by summing the evaluated prices for FFP Procedures, Incoming Transition, Outgoing Transition, Contractor Manpower Reporting (if not-separately-priced), and CR (no fee) for Travel, Shipping, and influenza vaccines for each period of performance.  The total evaluated price will be calculated as follows[.]

AR at 1244 (Solicitation Attachment 6).  The solicitation then notes the "total evaluated price" includes "[t]he total for period of performance" as well as "incoming transition":

> Procedures (FFP): The proposed fully loaded FFP value for each procedure will be multiplied by the Government-provided quantities to compute an extended price for each procedure in each period of performance as depicted in the Price Matrix Attachment.  All extended prices will be summed to derive a total for each period of performance.  The total for each period of performance will be summed to derive the evaluated price for the FFP fully loaded procedure value.
>
> Incoming Transition (FFP):  The proposed price in the Price Matrix for Transition-In will be included in the total evaluated price.

*Id.* at 1244–45.  The solicitation continues to explain how pricing will be calculated for the remaining items, which includes adding specific government-provided costs to the "base period" and option periods.  *Id.*  "An executive agency shall evaluate sealed bids and competitive proposals, and award a contract, based solely on the factors specified in the solicitation."  41 U.S.C. § 3701(a).  "The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."  10 U.S.C. § 2305(b)(1).

Plaintiff first argues, "because of the errors discussed [throughout plaintiff's brief], the Army improperly distorted the real differences between [plaintiff] and QTC's proposals."  Pl.'s MJAR 37–38.  The Court acknowledges the government should not "conduct its best-value analysis in a manner that minimize[s] the real differences between the proposals and create[s] a false impression of equivalence, thus allowing the [SSA] to base its decision largely on price instead of on the non-price factors."  *Id.* at 37 (citing *FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 379 (2011)).  Plaintiff, however, provides no argument to support its assertion the government conducted its best-value analysis in such a manner.  The government evaluated the "proposals, and award[ed] a contract, based solely on the factors specified in the solicitation."  41 U.S.C. § 3701(a).  The Court finds the government was reasonable in reviewing the parties' proposals for the reasons given *supra* throughout the previous analysis sections.

In accordance with the terms of the solicitation, 10 U.S.C. § 2305(b)(1), and 41 U.S.C. § 3701(a), the source selection authority considered the offerors' total evaluated prices in his

tradeoff analysis, without subtracting the prices of any base year procedures: "[plaintiff's] total evaluated price of $899,979,399.09 is 6.06%, or $51,396,460.79, higher than QTC's total evaluated price of $848,582,938.30." AR at 13257–59 (Corrective Action Source Selection Decision). The source selection authority also noted: "The Period of Performance of the proposed contract is a 12 month transition in base period and four, one year option periods. The minimum guarantee shall be $9,000,000.00 for the initial task order anticipated against the resultant IDIQ contract." *Id.* at 13245. The source selection authority calculated the offerors' total evaluated prices according to the following language the Court quoted from the solicitation *supra*:

> Procedures (FFP): The proposed fully loaded FFP value for each procedure was multiplied by the Government-provided quantities to compute an extended price for each procedure in each period of performance as depicted in the Price Matrix Attachment. All extended prices were summed to derive a total for each period of performance. The totals for each period of performance were summed to derive the evaluated price for the FFP fully loaded procedure value.

> Incoming Transition (FFP): The proposed price in the Price Matrix for Transition-In is included in the total evaluated price.

*Id.* at 13249; *see id.* at 1244–45.

As counsel for QTC explained, "what we're hearing from [plaintiff] is that [plaintiff] had a short transition and could have given the Government a discount on its prices for the base year, but didn't think about it . . . . So now they're complaining about the way the solicitation is structured." Tr. at 175:17–23. Certain calculations for nonincumbent pricing and transition were baked into scheduling for the solicitation, and the government was rational in following the requirements of the solicitation. Counsel for plaintiff does not cite any authority to support the proposition the government should ignore the solicitation and attempt to do its own "true relative cost" analysis; rather, plaintiff asks the Court to require the government to analyze the proposals and award the contract in contravention of the requirement to do so "based solely on the factors specified in the solicitation." 41 U.S.C. § 3701(a).[9] Not only was the government's action reasonable, what plaintiff asks the Court to require the government to do is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004); *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (Under the "'arbitrary and capricious' standard," "a court is not to substitute its judgment for that of the agency."). "Procurement officials have substantial discretion to determine which proposal represents the best value for the government," and the Court will not upset the government's decision to follow the requirements of the solicitation and the law. *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting E.*W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)).

---

[9] While the Court finds in favor of the government and QTC on the merits of this issue, the Court will consider their arguments *infra* that plaintiff's argument is also time barred under *Blue & Gold*.

## VIII.   The Government and QTC's *Blue & Gold* Arguments

In addition to responding to plaintiff's arguments on the merits, the government and QTC argue several of plaintiff's arguments are time barred under the Federal Circuit's decision in *Blue & Gold*, holding:  a plaintiff who "has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).  Absent such "a waiver rule, a contractor with knowledge of a solicitation defect could choose to stay silent when submitting its first proposal," and should it "lose[] to another bidder, the contractor could then come forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors." *Id.* at 1314.  Accordingly, the *Blue & Gold* waiver rule "prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation." *Id.*

The plaintiff in *Blue & Gold* alleged the agency erroneously analyzed the awardee's proposal to be financially advantageous for the government because the awardee's proposal did not comply with the Service Contract Act. *Id.* at 1312.  The solicitation, however, did not apply the Service Contract Act to the procurement. *Id.*  The agency in *Blue & Gold* was required, by statute, to "evaluate . . . proposals and make an award based solely on the factors specified in the solicitation." *Id.* at 1313 (quoting 10 U.S.C. § 2305(b)(1)).  The Federal Circuit recognized, despite plaintiff characterizing its claim as "a challenge to the evaluation of [awardee's] proposal," the claim was "properly characterized as a challenge to the terms of the solicitation." *Id.*

### A.  Plaintiff's Best Value Determination Argument

Counsel for the government stated at oral argument its "main *Blue & Gold* issue is . . . about the best value determination." Tr. 176:16–18.  Plaintiff argues the government's best value analysis was flawed because a portion of the price advantage the government determined for QTC was "illusory." *See* Pl.'s MJAR at 38; *see supra* at Section VII.  Along with arguments on the merits, the government responds by arguing plaintiff's "challenge to the best-value tradeoff is really an untimely challenge to the terms of the solicitation that is waived under *Blue & Gold*." Gov't Cross-MJAR at 34.  The government explains, "the Source Selection Authority considered the offerors' total evaluated prices in his tradeoff analysis, without subtracting the prices of any base year procedures," and this was "[i]n accordance with the terms of the solicitation and 10 U.S.C. § 2305(b)(1)." *Id.* at 35.  According to the government, because plaintiff "did not protest the inclusion of base year procedures in the total evaluated price before the deadline for proposal submission, nor did it protest the requirement to use the total evaluated price in the best-value tradeoff," this means "[u]nder *Blue & Gold*, [plaintiff] cannot argue that the Source Selection Authority acted irrationally by following the terms of the solicitation." *Id.*  At oral argument, counsel for the government noted plaintiff's argument that "there was an evaluation here or . . . in the source selection decision" is also the argument the plaintiff in *Blue & Gold* made, "saying that there was an error in how [the agency] evaluated the awardee's proposal, but [in *Blue & Gold*] the Federal Circuit recognized . . . that alleged error was a result

of the terms of the solicitation" and treated the argument as "really a challenge to the terms of the solicitation."  Tr. at 177:4–12.

Along with arguments on the merits, QTC asserts plaintiff's argument "that savings in the base period are 'illusory' because transition will consume part of the base period is a direct challenge" to the solicitation because the solicitation "contemplated a transition of up to 12 months yet also required offerors to price a full year of services during that same time period."  Def.-Intervenor's Cross-MJAR at 38–39 (internal citations omitted).

Plaintiff argues its "claim is timely" because it "is not challenging the RFP's provisions regarding how to calculate a total evaluated price ('TEP'); it is challenging the rationality of the agency's best value analysis."  Pl.'s Reply and Resp. at 28.  Plaintiff further asserts it is challenging whether the total evaluated prices "represent[] the actual difference in the expected cost of the two proposals."  *Id.* at 29 (citing AR at 13258–59).  At oral argument, counsel for plaintiff argued *Blue & Gold* does not apply in this case because "the face of the solicitation is not problematic, [and] it's only when a nonincumbent takes advantage of the transition and the incumbent pricing that there becomes a problem."  Tr. at 178:12–15.  Plaintiff insists it wasn't its "burden . . . to predict that a nonincumbent would take advantage of" the terms of the solicitation "and slash its base year prices."  *Id.* at 178:21–23.

The Federal Circuit explained the difference between patent and latent ambiguity in *Per Aarsleff A/S*, a 2016 case applying *Blue & Gold:*

> A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties.  By contrast, [a] latent ambiguity is a hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification.

*Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016) (internal quotation marks and citations omitted).  Plaintiff in this case could have "discovered by reasonable and customary care"—specifically by reading the terms of the solicitation from the perspective of any competitor to plaintiff's incumbent offer—that competitors would seek to take advantage of pricing mechanisms in the contract to offer more affordable proposals.  Plaintiff could have done as QTC did and tweaked its pricing in a method compliant with the terms of the solicitation to ensure its price remained competitive.  Plaintiff could also have objected at the pre-award stage to this perceived loophole in the requirements of the contract.  Instead, plaintiff increased its price proposal over the course of discussions.  AR at 1550 (LHI 29 June 2018 Proposal), 2300 (LHI 3 July 2019 Proposal).  The Court finds plaintiff "ha[d] the opportunity to object to the terms of a government solicitation containing [an alleged] patent error and fail[ed] to do so prior to the close of the bidding process"; plaintiff therefore "waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  *Per Aarsleff A/S,* 829 F.3d at 1312.

### B. Plaintiff's Overall Technical Evaluation Argument

Plaintiff argues the government's overall technical evaluation was "superficial and inadequate." Pl.'s MJAR at 23–26; *see supra* at Section IV.D. Along with arguments on the merits, QTC argues the "GAO thoroughly explained why this same protest ground boils down to an untimely challenge to the terms of the RFP." Def.-Intervenor's Cross-MJAR at 27 (citing GAO Advisory Op. at 8–10; *Blue & Gold*, 492 F.3d 1308). QTC notes, "before final proposal submissions, [plaintiff] had filed pre-award protests with the Agency and GAO complaining about the narrowness of the RFP's evaluation scenarios—and seeking a revision to the RFP" to instead "require offerors to propose a comprehensive technical solution for the full set of requirements under the PWS, and to provide that the agency will evaluate each offerors ability to meet those requirements." *Id.* at 27–28 (citing AR at 2718–22, 2681–91) (internal quotation marks omitted).

QTC argues plaintiff's choice to "accept[] the evaluation scheme set forth in the revised RFP and submit[] a proposal" bars plaintiff from "complain[ing] now that a different check-the-box evaluation for PWS compliance should have been performed." *Id.* at 28 (citing *Blue & Gold*, 492 F.3d at 1313–15 ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a [bid protest] action in the Court of Federal Claims")). QTC argues plaintiff's pre-award protests show plaintiff "had clear notice that the Agency intended to evaluate offerors' ability to satisfy the PWS requirements based on their responses to the technical scenarios," and plaintiff accordingly "cannot properly complain that the Agency should have performed and documented a different, requirement-by-requirement analysis as part of its evaluation." *Id.*

Plaintiff partially acknowledges QTC's argument in a footnote with what appears to be an accidentally incomplete sentence: "QTC claims that the Army need not provide its findings regarding every PWS task, and cites *Inspace 21 LLC v. United States*, 128 Fed. Cl. 69 (2016) and claiming. [sic]" Pl.'s Reply and Resp. at 16 n.8. Plaintiff subsequently attempts to distinguish *Inspace 21* on its facts, *see id.*, without engaging the rule statement QTC cites, which the Court discussed *supra* at Section IV.D.

The Court understands plaintiff to argue the government failed to follow requirements listed in the solicitation "to evaluate proposals against the major requirements of the entire PWS" and in FAR 15.308 that the "'source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against *all source selection criteria* in the solicitation.'" Pl.'s MJAR at 23 (emphasis in plaintiff's brief).[10] Additionally, the FAR requires the "relative

---

[10] The GAO's advisory opinion states it "would have dismissed this argument as untimely" because it "would have viewed [plaintiff's] allegation as raising a patent ambiguity in the terms of the solicitation that the firm was required to raise prior to the closing date for receipt of initial proposals." GAO Advisory Op. at 9, 10. Specifically, the GAO says its timeliness rule would apply "to the extent [plaintiff] believed the solicitation's overarching approach language obligated the agency to evaluate in a manner that was inconsistent with the solicitation's establishment of technical scenarios," since "such inconsistency was apparent from the face of the solicitation, creating a patent ambiguity." *Id*. at 10. Plaintiff asks the Court to conduct far too searching of an inquiry into the government's decision, but its request the Court apply the provisions of the solicitation and the FAR is not a challenge to a patent ambiguity in the solicitation because it is not a request for "the agency to evaluate in a manner that was inconsistent

strengths, deficiencies, significant weaknesses, and risks supporting proposal evaluation . . . be documented in the contract file." FAR 15.305(a). It also requires an "assessment of each offeror's ability to accomplish the technical requirements" and a "summary, matrix, or quantitative ranking, along with appropriate supporting narrative, of each technical proposal using the evaluation factors." FAR 15.305(a)(3). Plaintiff's complaint is with the agency's action, not with the solicitation. While the Court finds on the merits the government conducted a reasonable overall technical evaluation, *see supra* at Section IV.D., plaintiff's argument is not time barred because plaintiff's argument asks the Court to analyze the "award [decision] based solely on the factors specified in the solicitation." *Blue & Gold*, 492 F.3d at 1313 (quoting 10 U.S.C. § 2305(b)(1)).

### C.  Plaintiff's Balanced Pricing Argument

Plaintiff argues the government was required—and failed—to determine whether individual procedure prices were unbalanced. *See* Pl.'s MJAR at 29–37; *see supra* at Section VI. Along with providing arguments on the merits, the government notes, "[t]o the extent that [plaintiff] is arguing that DoD *should have* designated the individual procedures as subline items, in order to trigger a requirement to evaluate their prices for balance, that is a challenge to the terms of the solicitation that [plaintiff] has waived." Gov't MJAR at 30–31 (citing *Blue & Gold*, 492 F.3d at 1313; *Per Aarsleff A/S*, 829 F.3d at 1313).

Along with arguments on the merits, QTC argues the RFP "did not indicate that the Agency would evaluate pricing or risk based on materially different quantities than those set forth in the RFP for the preparation of proposals"; thus, according to QTC, under *Blue & Gold* "[i]t is far too late for such a challenge now." Def.-Intervenor's Cross-MJAR at 37 (citing *Blue & Gold*, 492 F.3d at 1313–15). QTC adds, "[b]ecause [plaintiff] did not timely dispute the accuracy of the RFP's estimated quantities, it is too late to contend that the Agency should have analyzed the risk of balance by assuming materially different quantities than those set forth in the RFP." *Id.* at 37–38.

Plaintiff responds to the government's timeliness arguments by arguing the solicitation itself calls for the evaluation of line and subline items, which it asserts was "required by the RFP." Pl.'s Reply and Resp. at 23 n.12. Counsel for plaintiff observed at oral argument, "[t]here was certainly nothing in the solicitation that said [the individual procedure prices] are not line items," and argued the solicitation was "not sufficient to . . . put [plaintiff] on notice that the agency didn't view those [procedures] as subline items." Tr. at 182:9–11, 182:18–20.

The Court understands plaintiff's argument to be that the government failed the requirement under the solicitation "to evaluate whether each offeror's prices were balanced under FAR 15.404-1(g)," which "requires an agency 'to determine, among other potential pitfalls, whether the *unit prices* are unbalanced.'" Pl.'s MJAR at 29–30 (quoting *Al Ghanim Combined Grp. Co. Gen. Trade v. United States*, 56 Fed. Cl. 502, 513 (2003)) (emphasis in plaintiff's brief). Plaintiff notes the FAR requires: "All offers with separately priced line items or subline items shall be analyzed to determine if the prices are unbalanced." *Id.* at 30 (quoting

---

with the solicitations establishment of technical scenarios"; thus, the Court disagrees with the GAO and finds plaintiff's request is not time barred.

FAR 15-404.1(g)(2)).  According to plaintiff, the solicitation's individual procedure prices are subline or unit items and the government erred in not assessing those subline or unit items.  *Id.* ("[T]he agency never evaluated whether QTC's individual unit-level prices for the different procedures were unbalanced.").  This is a dispute over the rationality of agency action, not a dispute with the solicitation.  As the government agreed at oral argument, "to the extent that [plaintiff] is arguing that the agency did, in fact, designate . . . the individual procedures as subline items, then yeah, I would agree that that's not a *Blue & Gold* issue."  Tr. at 183:17–21.  While the Court finds on the merits the government conducted a reasonable balanced pricing inquiry, *see supra* at Section VI, plaintiff's argument is not time barred because plaintiff's argument asks the Court to analyze the "award [decision] based solely on the factors specified in the solicitation."  *Blue & Gold*, 492 F.3d at 1312.

## IX.   Injunctive Relief

In its motion for judgment on the administrative record, plaintiff requested a permanent injunction.  *See* Pl.'s MJAR at 39.  The Court considers the following factors when determining whether to issue a permanent injunction:  "(1) whether . . . the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief."  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).  According to the first factor, plaintiff is not entitled to injunctive relief because plaintiff does not prevail on the merits.  The Court therefore does not consider the remaining factors of the test for a permanent injunction.  *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) ("Absent success on the merits, the other factors are irrelevant.").

## X.   Conclusion

For the foregoing reasons, the Court **DENIES** plaintiff's motion for judgment on the administrative record, **GRANTS** the government's cross-motion for judgment on the administrative record, and **GRANTS** defendant-intervenor's cross-motion for judgment on the administrative record.  The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge